**No. 23-35423**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

HUI XU,

*Plaintiff-Appellant,*

v.

LIGHTSMYTH TECHNOLOGIES, INC., *a Delaware Corporation, and*
FINISAR, *a Delaware Corporation*,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Oregon
No. 6:20-cv-01201-MC
Hon. Michael McShane

_____

**APPELLANT'S OPENING BRIEF**

_____

Kevin T. Lafky, OSB #852633
James P. Francis, OSB #223268
LAFKY & LAFKY
429 Court Street NE
Salem, Oregon 97301
Ph: 503.585.2450
Email: klafky@lafky.com
Email: jfrancis@lafky.com

*Attorneys for Plaintiff-Appellant Hui Xu*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................v

JURISDICTIONAL STATEMENT ...........................................................1

STATUTORY AND CONSTITUTIONAL AUTHORITIES..................................1

ISSUES PRESENTED...............................................................................1

STATEMENT OF THE CASE....................................................................2

    I.     Facutal Background................................................................2

           1.  *Overview and Background*................................................2

           2.  *2014: Finisar Acquires Lightsmyth*.....................................4

           3.  *Summer 2015- Summer 2016.* .............................................4

           4.  June 2016: *Brown Assumes Supervision of Plaintiff.* .........5

           5.  *November 2016: Defendants Notified of Disability.*...........5

           6.  *April 2017: Plaintiff Gives Doctor's Note to Defendant.*.....7

           7.  *February 25, 2018: Protected Complaint.* ........................8

           8.  *March 26, 2018: Plaintiff's Demotion* ...............................9

           9.  *April 26, 2018: Demotion is made permanent.*.................10

          10. *May 2018- November 2018: Final Performance Review and Increased Harassment.* .................................10

          11. *October-November 2018: Worsening Health* .................11

          12.  *Plaintiff Requests Leave and is Discharged* ...................11

II.     Procedural Posture ...............................................................12

     1.    *Complaint and Claims.* ...................................12

     2.    *Motion for Summary Judgment* ......................13

     3.    *Motion for the Imposition of Sanctions.* ...........14

SUMMARY OF THE ARGUMENT ...............................................14

ARGUMENT .................................................................................16

I.     The District Court Erred when it Found that Most of Plaintiff's Claims were Time Barred ..............................................17

     A.    Standard of Review .................................................17

     B.    Argument . ..............................................................17

II.     The District Court Erred in Granting Defendant's Motion for Summary Judgment on Plaintiff's Disparate Treatment Claims (I, II, IV, and VI) finding that Plaintiff had not demonstrated an adverse employment action ...............................................19

     A.    Standard of Review .................................................19

     B.    Argument. ...............................................................20

     1.    *Adverse Employment Actions* ...........................20

     2.    *Causation.* ...........................................................21

     3.    *Plaintiff's Adverse Employment Actions.* ...........23

III.     The District Court Erred in Granting Defendant's Motion for Summary Judgment When it Found that Plaintiff had not suffered from a Hostile Work Environment ......................................33

     A.    Standard of Review .................................................33

     B.    Argument ................................................................34

IV.  The District Court erred in Granting Defendant's Motion for Summary Judgment on Plaintiff's Wrongful Discharge Claims .........39

    A.  Standard of Review ..................................................................39

    B.  Argument. .................................................................................40

V.  The District Court erred in Granting Defendant's Motion for Summary Judgment on Plaintiff's Disability Claims III and VII........42

    A.  Standard of Review ..................................................................43

    B.  Argument. .................................................................................43

        1.  *Plaintiff's Disability*. ..........................................................43

        2.  *Defendant's Failure to Accommodate*...............................45

VI.  The District Court Erred when it Granted Defendant's Motion for Imposition of Sanctions. .......................................................48

    A.  Standard of Review ..................................................................48

    B.  Argument ..................................................................................48

        1.  *Counsel was Entitled to Rely on Plaintiff's Representations*. .................................................................49

        2.  *Plaintiff Acted in Good Faith*...........................................50

CONCLUSION ...........................................................................................52

STATEMENT OF RELATED CASES ....................................................53

CERTIFICATE OF COMPLIANCE ......................................................54

CERTIFICATE OF SERVICE ................................................................55

# TABLE OF AUTHORITIES

**Cases**                                                       **Page(s)**

*Aichele v. Blue Elephant Holdings, LLC*
  292 F. Supp. 3d 1104, (D. Or. 2017).............................................................20

*Alpha Energy Savers, Inc. v. Hansen*

  381 F.3d 917, (9th Cir. 2004) ......................................................................30

*Bonds v. District of Columbia*
  93 F.3d 801, 808 (D.C. Cir. 1996.................................................................52

*Boynton-Burns v. Univ. of Or.*

  197 Or.App. 373, 105 P.3d 893 (2005) ................................................... 22,28

*Bragdon v. Abbott*
  524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) ......................43

*Burlington N. & S. F. R. Co. v. White.,*
  548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) .......................... 20, 24

*Clemons v. Nike, Inc.,*
  2007 WL 2890972,  (September 28, 2007, D.Or., J. King) .........................40

*Coszalter v. City of Salem,*
  320 F.3d 968, 975 (9th Cir. 2003) ...............................................................20

*Deleon v. Kalamazoo County Road Com'n,*
  739 F.3d 914 (6th Cir. 2014) .......................................................................24

*E.E.O.C. v. Nucletron Corp,*
  563 F.Supp.2d 592, (D. Maryland 2008)......................................................29

*E.E.O.C. v. United Parcel Service, Inc.,*
  424 F.3d 1060, (9th Cir. 2005) ....................................................................44

*Ellison v. Brady*,
    924 F.2d 872, 879 (9th Cir.1991) ........................................................... 34, 36

*Harris v. Forklift Sys., Inc,*
    510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) ...........................34

*Huber v. Oregon Dep't. of Educ.*
    235 Or. App. at 241, 230 P.3d 937 (2010) ........................................... 22, 28

*Insurance Corp. v. Compagnie des Bauxites de Guinée*
    456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982) ................................52

*Johnson v. Kroger Co,*
    319 F.3d 858, (6th Cir. 2003). ......................................................................40

*Kapco Mfg. Co. v. C & O Enters., Inc*,
    886 F.2d 1485, 1491 (7th Cir.1989) .............................................................48

*Kauffman v. Sidereal Corp,*
    695 F.2d 343, 345 (9th Cir.1982) .................................................................21

*Kinee v. Abraham Lincoln Fed. Sav. & Loan Ass'n,*
    *365 F.Supp. 975 (E.D.Pa.1973)* ..................................................................49

*Kortan v. Cal. Youth Auth*,
    217 F. 3d 1104 (9th Cir. 2000) ............................................................... 35, 36

*Lawson v. Reynolds.,*
    264 Fed. App'x 546 (9th Cir. 2008)....................................................... 26, 28

*Lipsett v. University of Puerto Rico,*
    864 F.2d 881, 898 (1st Cir.1988)..................................................................36

*Little v. Windermere Relocation, Inc*
    301 F.3d 958, 967 (9th Cir. 2002) ...............................................................34

*Lucke v. Multnomah County*
    2008 WL 4372882, at *23 (D.Or. Sept. 22, 2008) ................................ 17, 18

*Maclin v. SBC Ameritech.*,
    520 F.3d 781, 789 (7th Cir. 2008) ..................................................................23

*Meyer v. Oregon Lottery*,
    292 Or. App. 647, 681-82, 426 P.3d 89 (2018).................................... ........22

*Miller v. Fairchild Indus.*,

    885 F.2d 498, 505 (9th Cir.1989) ..................................................................30

*Noyes v. Kelly Services*
    , 488 F.3d 1163, 1170 (2007) ........................................................................40

*Olsen v. Idaho State Bd. of Medicine*,
    363 F.3d 916, 922 (9th Cir. 2004) ........................................ 17, 19, 36, 39, 43

*Passantino v. Johnson & Johnson Consumer Prods., Inc*,
    212 F.3d 493, 507 (9th Cir.2000) ..................................................................21

*Price v. Wheeler*,
    834 Fed. App'x 849 (5th Cir. 2020) ............................ ........................ 26

*Ruggles v. California Polytechnic State Univ.*,
    797 F.2d 782, 785 (9th Cir.1986) ..................................................................21

*Sanchez v. Santa Ana*,
    No. 3:15-CV-01070-AA, 2017 WL 6029605 (D. Or. Dec. 3, 2017) ...........35

*Schnidrig v. Columbia Machine, Inc*
    80 F.3d 1406, 1412 (9th Cir.1996)).............................................................40

*Sheets v. Knight*,
    308 Or. 220 (1989) .............................................................................. 41, 42

*St. John v. Employment Development Dept*,
    642 F.2d 273, 274 (9th Cir.1981) .......................................................... 20-21

*Strother v. Southern California Permanente Medical Group*,
    79 F.3d 859, 869 (9th Cir.1996) ....................................................................20

*Thomas v. City of Beaverton*,
    379 F. 3d 802 (9th Cir. 2004) ........................................................................30

vii

*United Air Lines, Inc. v. Evans.*,
    431 U.S. 553 (1977) ............................................................................ 14, 18

*US Airways, Inc. v. Barnett*,
    535 U.S. 391 (2002) ................................................................................. 47

*Van Asdale v. Int'l Game Tech.*,
    577 F.3d 989, 1003 (9th Cir. 2009) ........................................................ 30

*Villiarimo.*,
    281 F. 3d 1065 ......................................................................................... 26

*Watson v. Nationwide Ins. Co.,.*,
    823 F. 2d 360, (9th Cir. 1987) ................................................................ 40

*White v. Burlington N. & Santa Fe Ry. Co*,
    364 F.3d 789, 795 (6th Cir.2004) ............................................................ 24

*Yartzoff v. Thomas*,
    809 F.2d 1371, 1376 (9th Cir.1987) ............................................. 20, 21, 26

**Statutes**

    29 U.S.C. § 623 .......................................................................................... 1

    28 U.S.C. § 1331 ........................................................................................ 1

    28 U.S.C. § 1367 ........................................................................................ 1

    42 U.S.C. § 2000e-2 ................................................................................. 13

    42 U.S.C. § 12112 .................................................................................... 13

    29 U.S.C. § 623 ........................................................................................ 13

    38 U.S.C. § 4323(b)(3), ............................................................................. 1

    29 U.S.C. § 623 ........................................................................................ 13

    Or. Rev. Stat. § 659A.030 ....................................................................... 12

    Or. Rev. Stat. § 659A.199 ....................................................................... 12

    Or. Rev. Stat. § 659A.112 ....................................................................... 12

Or. Rev. Stat. § 659A.060 ....................................................................13

**Rules**

FRAP 26 ..............................................................................................49

FRCP 37...............................................................................................50

**Other Authorities**

C.F.R. § 1630.2...................................................................................43

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1331, 38 U.S.C. § 4323(b)(3), and 28 U.S.C. § 1367. The district court entered a final judgment disposing of all of plaintiff's claims with prejudice on May 25, 2023. ER-7. Plaintiff filed a timely notice of appeal pursuant to Fed. R. App. P. 4(a) on June 19, 2023. ER-277.

# STATUTORY AND CONSTITUTIONAL AUTHORITIES

All relevant statutory and constitutional authorities appear in the Addendum to this brief.

# ISSUES PRESENTED

1. Did the district court err in granting Defendant's Motion for Summary Judgment when it found that the majority of Plaintiff's claims were time barred?

2. Did the district court err in granting defendant's motion for summary judgment on Plaintiff's Disparate Treatment Claims (1, 2, 3, and 4), when it found that no reasonable juror could find that Plaintiff suffered an adverse employment action?

3. Did the district court err in granting defendant's motion for summary judgment on Plaintiff's hostile work environment claims 1 & 6 when it found that Plaintiff had not suffered from a hostile work environment?

1

4. Did the district court err in Granting Defendant's Motion for Summary Judgment on Plaintiff's Wrongful Discharge Claims.

5. Did the district court err in granting summary judgment on Plaintiff's disability claims 3 & 7 by finding that Plaintiff was not disabled, defendants had accommodated Plaintiff's requests, and Plaintiff had not suffered an adverse employment action?

6. Did the district court err in granting defendants Motion for Imposition of Sanctions due to Plaintiff's alleged bad faith during discovery?

## STATEMENT OF THE CASE

### I. Factual Background

#### 1. *Overview and Background*

Plaintiff is an Asian-American woman of Chinese national origin. Everyone that worked for Defendants knew that she was an Asian-American woman and that English was not her native language. She began working at Defendant Lightsmyth in its Eugene facility in January 2012. She was initially hired as a Manufacturing Technician. ER-258. In March 2012, Plaintiff was given a promotion. *Id*. With this promotion, Plaintiff acquired new duties involved with supply chain management. ER-78-80. Duties associated with this position included Optical Efficiency (OE) testing, OE reports, supply chain management, preparing shipping documents, among others. However, as part of her supply chain duties, Plaintiff was not

required to perform visual inspections. ER-261 and ER-78-80. Additionally, when hired for the role of manufacturing technician, the job description contained the required duties and responsibilities. ER- 72-75. Plaintiff was required to be trained and certified in only one of the following functions:

<u>Job Duties and/or Responsibilities</u>

- Inspection and photographing of wafers.
- Cleaning material used in manufacturing to produce product.
- Plucking diced wafers.
- Visual inspection of gratings according to specified pass/failed criteria
- Labeling of grating product, taking final photos, operate labeling software.
- Optical efficiency testing of reflective and transmission gratings
- Flatness testing using Zygo interferometer
-Total Thickness Variation (TTV) testing using TTV test station.
- Operating dicing saw
- Operating coating chamber
- Operating bonding rig

*Id*. Performing visual inspections was never a primary or essential function of Plaintiff's job. ER-281. According to the job description provided by Defendants and signed by Plaintiff, she only needed to trained and certified in one of the above areas. ER-78-81.

After beginning her work with Defendants, Plaintiff was then subjected to harassing, belittling, and abusive behavior at the hands of her employer. ER-260.

3

This conduct occurred over many years and was carried out by numerous individuals within the organization. *Id.*

### 2. *2014: Finisar Acquires Lightsmyth*

In 2014, Defendant Finisar acquired Defendant Lightsmyth and made an offer of employment to Plaintiff. ER-76. This offer of employment was made via letter on May 1, 2014. In the offer, Plaintiff was specifically hired for the position of Supply Chain Manager and was to be paid a salary of $38,195 per year. *Id.* ("I am pleased to present to you this contingent offer of employment with Finisar in the position of Supply Chain Manager").

### 3. *Summer 2015- Summer 2016*

During 2015 and 2016, Plaintiff performed her role as a salaried supply chain manager but with added manufacturing technician duties. Her performance was incredibly well received and Defendants had very few complaints about Plaintiff's on the job work. In fact, in an August 2015 review, Plaintiff's supervisor Dmitri Izaikov stated that "Hui is very tenacious in checking and double checking her work," "she is intelligent and understands tasks well," and "she is respectful and responsive to management." ER-106-107. Similarly, in May 2016 the same supervisor gave Plaintiff another positive review stating that "Hui is a hard worker prepared to go the extra mile," "she has high perseverance," "Hui is critical in

optical testing across multiple product lines," and Hui is a "reliable employee." ER-108-109.

### *4. June 2016: Brown Assumes Supervision of Plaintiff*

In June 2016, Plaintiff, was informed that she would no longer reports to Dmitri Izaikov but rather Catherine Brown, who Plaintiff had made allegations of harassment against. Ms. Brown was Defendant's Director of Operations. ER-163. Catherine Brown has a history with Defendants of making employees feel belittled and harassed. *See generally* ER 153-161.

### *5. November 2016: Xu Notifies Defendants of her Disability*

On November 2, 2016, Plaintiff notified Lead Liza Dayton that her "eyes were failing" her and that she was having difficulty placing labels correctly. Despite this plea for help, roughly two hours later, Ms. Dayton complained about Plaintiff's disability and informed the entire clean room that Hui had difficulty placing labels correctly. ER-261. This was a symptom of Plaintiff's ocular disability. Following this, Lead Dayton's interactions with Plaintiff became more harassing, belittling, aggressive, and abusive. Specifically:

• Ms. Dayton frequently complained to Plaintiff's supervisor regarding the nature and quality of Plaintiff's voice:

- February 15, 2017 email: "her high voice." Lafky decl. Exhibit #25 ER-181.

5

- May 24, 2017 email: complaining about Plaintiff's "nose problem with your high voice." Lafky decl. Exhibit #25. ER-104.

- September 21, 2017 email: "she have her [sic] high pitch of voice." Lafky decl. Exhibit #25. ER-200

- October 17, 2017 email: describes voice as "high pitch." Lafky decl. Exhibit #25. ER-206

- November 3, 2017 email: "her high voice." Lafky decl. Exhibit #25. ER-209

Lead Dayton treated non-female employees differently than female employees. ER-180. ("Q. Are you aware of every time that Liza Dayton or Catherine Brown criticized the performance of any of your male co-workers? A. I saw what I saw. And I also did not see her criticize other male co-workers in the same way").

Dayton had a history of intimidating and using abusive language towards those under her supervision. Specifically referring to a former employee of Defendant as a "Bitch" on more than one occasion. ER-153

Dayton was known by Defendants to be a confrontational leader: "We had agreed in the past, that due to English not being Liza's first language, her emails may come across as being direct and confrontational." ER-173

Dayton was known to threaten employees with certain punishments for not performing up to her standards. *See generally* ER 153. Dayton has also criticized the volume of Plaintiff's voice. ("every time she raised her voice"). ER-187.

6

### 6. *April 2017: Plaintiff Gives Doctor's Note to Defendant*

Plaintiff gave Defendant's a note from Bala Ambati, M.D., PhD. ER-82. This note was dated April 11, 2017. *Id.* In this letter, Dr. Ambati indicated that Plaintiff was currently under her care for cataracts and dry eye. *Id.* Additionally, Dr. Ambati advised that Plaintiff "needs frequent breaks from looking through the microscope and should be excused from looking through the scope for continuous periods greater than 30 minutes." *Id.* As noted in the doctor's note, Plaintiff experienced an increased need for breaks. This was primarily due to Plaintiff's disability and other documented medical problems. ER-261. Additionally, Plaintiff was a salaried employee who did not have to use the time clock to record her time. ER-162. Defendants' policy included a lenient break policy. In accordance with Oregon law, Defendants offered two paid fifteen minute breaks as well as one thirty minute unpaid meal per a normal shift. ER-253. Additionally, in a March 26, 2018 email, Defendant's clarified their break policy further:

> Breaks: Non-exempt employees get two paid fifteen minute breaks, and a thirty minute unpaid meal break (you must clock out during your meal breaks). <u>As we discussed, please ensure that any necessary bathroom breaks outside your rest breaks are limited to ten minutes</u> or less. Breaks cannot be combined or missed to leave early or come in late.

ER-145. Despite this need, Plaintiff was regularly harassed regarding her breaks by Defendant and their employees. ER-260. For example, on June 12, 2018 Lead Dayton reported a supposed violation of Finisar policy to Catherine Brown who

indicated that she reviewed Plaintiff's timecard and did not "see any issues." ER-187. On December 3, 2018, another one of Defendant's Lead Technicians (Casey Frey) emailed Plaintiff's supervisor Catherine Brown regarding Plaintiff's violation of break policy. ER-74. The email stated that Plaintiff's "violation" was using the restroom from 10:25-10:35. *Id.*, a break allowed by Defendant's own policy. Lastly, in 2017, Lead Dayton would frequently force Plaintiff to take breaks despite knowing that she was still a salaried employee and was not required by law or policy to take breaks. ER-253 (providing under headers "Meal Time" and "Rest Periods:" "For non-exempt employees..."). Lead Dayton would also report Plaintiff's alleged violations to her supervisors. ER-187. Ultimately, Lead Dayton regularly and systematically criticized, questioned, and scrutinized Plaintiffs breaks when she did not question other employees who took similar breaks. ER-259-260.

### 7. *February 25, 2018: Protected Complaint*

On February 25, 2018, Plaintiff sent an email to Gil Cohen indicating that she feels that she is being harassed, discriminated against, and retaliated against. ER 165. As one example, Plaintiff informed Defendant that she was being made to perform packaging duties using what is called "remnants packaging." *Id.* Specifically, Plaintiff complained that she was made to perform these duties while younger, white coworkers were not. ER- 180 ("A. I then discovered that both

Patrick and Eric, two young Caucasian men, was also not asked just like Brandon Brown in October 2017, not being asked using remnant scrap for packaging"). Following this complaint, Defendant's Human Resources performed an investigation. Plaintiff was informed of this decision on March 27, 2018 via an email from Neel Dhar. ER-163.

### 8. *March 26, 2018: Plaintiff's Demotion*

Approximately one month after contacting Defendant and making her protected complaint, Plaintiff had a meeting with HR and her supervisor Catherine Brown on March 22, 2018. ER-145. During this meeting, Brown decreed that Plaintiff's title would be changed from "Supply Chain Manager to Manufacturing Technician, effective March 26, 2018." *Id*. In the same letter, Plaintiff was informed that her salary status is also changing to an hourly non-exempt position. *Id*. Plaintiff was disciplined further and told that she will need to monitor her breaks and vacate her cubicle. *Id*. Specifically, Plaintiff was told that:

> Breaks: Non-exempt employees get two paid fifteen minute breaks, and a thirty minute unpaid meal break (you must clock out during your meal breaks). As we discussed, please ensure that any necessary bathroom breaks outside your rest breaks are limited to ten minutes or less.

*Id*. Despite this, Plaintiff was routinely scrutinized over her use of breaks in a manner consistent with Defendant's policies as laid out in the March 26, 2018 email. *Id*. Approximately two weeks after this meeting, and after Plaintiff had been

harassed by Lead Dayton and Catherine Brown over her use of a bathroom break, Plaintiff sought clarification from HR. ER-81. Defendant immediately changed course and indicated that bathroom breaks are essentially not allowed. *Id.* ("you appear to believe that you are entitled to additional time... to use the bathroom. However, that is not the case.").

Plaintiff was also informed that the title change and the exempt status change are only temporary and they will "try out" the demotion for a period of one month. ER-145.

### 9. *April 26, 2018: Demotion is Made Permanent*

Based upon Defendant's own records, the trial period expired after one month. *Id.* Therefore, it is undisputed that Plaintiff's demotion was made permanent on April 26, 2018. *Id.* Despite this clearly being a demotion, Defendant attempts to frame this as simply an accommodation. In the March 26, 2018 email memorializing this meeting, it is noted that this "accommodation" was being made as a direct result of the letter provided by Plaintiff's medical doctor. ER-145.

### 10. *May 2018-November 2018: Final Performance Review*

Plaintiff had her final Performance review on May 8, 2018. Plaintiff's performance was objectively rated lower than it had been in previous years and the language used in the review was significantly more critical and negative. ER-112-114. Despite this, Plaintiff's alleged misuse of break periods was not documented

10

in her performance reviews. *Id.* Neither was Plaintiff's alleged conduct towards her peers and supervisors. *Id.*

### 11. *October-November 2018: Plaintiff's Worsening Health*

On October 15, 2018, Plaintiff provided an updated Doctor's Note indicating that she was suffering from a substantial increase in her blood pressure. ER-91. On or around November 1, 2018, Plaintiff provided another Doctor's note from Jane Mossberg, M.D. This note directly tied many of Plaintiff's medical issues to the harassment at the hands of Defendants. *Id.* Following these Doctor's notes, Plaintiff made a protected complaint to Neel Dhar on November 11, 2018 regarding the impact that the continued harassment and discrimination was having on her health. Plaintiff requested a new supervisor. ER-260.

On November 16, 2018, Plaintiff received a phone call from Neel Dhar. During this conversation, Ms. Dhar informed Plaintiff that she should "resign and leave with dignity." *Id.* Additionally, Plaintiff indicated that she did not want to resign but HR pushed her to consider it. ("A. I said I did not want to resign; Q. Anything else?; A. She said don't answer this question right now. Think -- consider about resigning on the weekend."). ER-180. Despite this conversation, Ms. Dhar later claimed that Defendants were committed to keeping Plaintiff on as an employee.

### 12. *Plaintiff Requests Leave and is Discharged*

During her tenure with Defendants, Plaintiff frequently believed that Defendant was attempting to terminate her ER-260. Plaintiff was correct. At numerous times during her employment, and despite frequent positive performance reviews, multiple Defendant managers inquired about potentially terminating her employment. Gil Cohen and Sheila Roberts discussed it on February 17, 2017 ("[b]elow email from Hui. Let's discuss over the phone, but look like this is not working maybe we need Hui let go"). ER-79 Neel Dhar encouraged Plaintiff to resign in November 2018. ER-260. Managers Dmitri Izaikov and Catherine Brown discussed it in January 2019 and advocated for it. ER-228. Plaintiff then requested leave and was discharged by Defendants when she did not return from leave when told to do so.

## II.    Procedural Posture

### *1. Complaint and Claims*

Plaintiff filed this lawsuit in the U.S. District Court for the District Court of Oregon, Eugene Division, on July 23, 2020. Plaintiff alleged the following claims:

| Claim | Description | Authority |
|-------|-------------|-----------|
| Claim 1 | Discrimination: Race, Sex, National Origin and Age | ORS 659A.030(1)(a),(b) |
| Claim 2 | Whistleblower Retaliation | ORS 659A.199 |
|  |  |  |

| Claim 3 | Disability Discrimination and Failure to Accommodate | ORS 659A.112 |
|---------|---------|---------|
| Claim 4 | Retaliation: Opposing Unlawful Employment Action | ORS 659A.030(1)(f) |
| Claim 5 | Wrongful Discharge | Common Law |
| Claim 6 | Discrimination: Race, Sex, National Origin | 42 U.S.C. 2000e-2 |
| Claim 7 | Discrimination: Disability | 42 U.S.C. 12112 |
| Claim 8 | Retaliation: Reported Violations of Overtime Laws | ORS 659A.060(a) |
| Claim 9 | Discrimination: Age | 29 U.S.C. 623 (ADEA) |

Following the typical answer process, discovery took place which included both paper and deposition discovery. Plaintiff and many of Defendant's employees were deposed.

### 2. Motion for Summary Judgment

Defendants filed their Motion for Summary Judgment on December 27, 2022. Plaintiff's submitted their response to the Motion for Summary Judgment on February 11, 2023. Defendant's reply was filed with the Court on March 13, 2023.

13

The Court issued its ruling and opinion on the Motion for Summary Judgment on May 25, 2023. Plaintiff timely submitted a Notice of Appeal on June 19, 2023.

### 3. Motion for Imposition of Sanctions

Defendant's filed their Motion for the Imposition of Sanctions on December 9, 2022. Plaintiff submitted their response on January 20, 2023. Defendant's reply was submitted on February 3, 2023. The Court took the matter under advisement and issued its opinion and order on February 27, 2023.

## SUMMARY OF THE ARGUMENT

The district court erred when it granted the Defendant's motion for summary judgment and motion for the imposition of sanctions. For the brief reasons set forth below, and more fully in this brief, this Court should reverse the order of the district court.

First, the district court erred when it granted Defendant's Motion for Summary Judgment by finding that a majority of Plaintiff's claims were time barred. Courts have held that while time barred acts may not be directly actionable, it is relevant evidence to support timely claims. *See e.g. United Air Lines, Inc. v. Evans*, 431 U.S. 553 (1977) (holding that untimely evidence of an employer's discriminatory acts "may constitute *relevant* background evidence in a proceeding in which the status of a current practice is at issue").

Second, the district court erred when it granted Defendant's Motion for Summary Judgment by finding that Plaintiff could point to no timely adverse employment action and that Plaintiff could not show a causal connection sufficient to overcome summary judgment. In fact, Plaintiff can demonstrate three adverse employment actions. Additionally, the temporal proximity of the adverse employment actions coupled with the other evidence presented below, satisfies the causation prong of Plaintiff's prima facie case.

Third, the district court erred when it granted Defendant's Motion for Summary Judgment on Plaintiff's hostile work environment claims. However, Plaintiff's workplace environment was so severe and pervasive as to render the workplace hostile.

Fourth, the district court erred when it granted Defendant's Motion for summary judgment on Plaintiff's Wrongful Termination claims. In this section, the district court analyzed Plaintiff's claims 3 and 7. The district court incorrectly concluded that Plaintiff has shown no evidence of pretext and therefore her wrongful discharge and retaliatory discharge claims fail. The district court completely ignored the temporal proximity of the termination to protected activity and also failed to fully address plaintiff's constructive discharge claim.

Fifth, the district court erred when it granted summary judgment on Plaintiff's disability claims (3 and 7). Specifically, the district court erred by

concluding that (1) Plaintiff was not disabled and (2) that Plaintiff had not suffered an adverse employment action as it relates to her disability. For the reasons put forth below, these conclusions were in error.

Sixth, the district court erred when it granted Defendant's Motion for the Imposition of Sanctions. Defendant filed a motion for the recovery of costs and fees (which the court more accurately described as a motion for imposition of sanctions).

## ARGUMENT

The district court erred when it granted Defendant's Motion for Summary Judgment based on its finding that Plaintiff had not presented sufficient evidence on her various claims. For ease of navigation, Plaintiff's arguments here are structured in the manner the district court structured its ruling. Section I addresses Plaintiffs Claims that the district court believed were time barred; Section II addresses Plaintiff's disparate impact claims (1, 2, 4, and 6); Section III addresses Plaintiff's hostile work environment claims; Section IV addresses Plaintiff's Wrongful Discharge Claims (1, 2, 5, and 6); Section V addresses Plaintiff's disability claims (3 and 7); Lastly, Section VI addressed Plaintiff's appeal of the district court's imposition of sanctions.

I. **The District Court Erred when it Found that most of Plaintiff's Claims were Time Barred.**

The district court erred when it granted Defendant's Motion for Summary Judgment by finding that a majority of Plaintiff's claims were time barred.

A. **Standard of Review**

A district court's decision to grant or deny summary judgment is reviewed de novo. *Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004). On review, the appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Olsen*, 363 F.3d at 922.

B. **Argument**

In its final order, the District Court cited to statutes, rules, and cases that stand for the proposition that Plaintiff's acts are time barred. As Plaintiff conceded during motion practice, actions that occurred prior to the April 2018 cut-off may not be directly actionable. However, courts have agreed that conduct occurring outside of the statutory period may inform the court's analysis of whether a question of fact exists that discrimination occurred. For example, in *Lucke,* the Federal District Court for Oregon noted that, "while time-barred acts may not be considered for purposes of liability, evidence of time-barred acts may be

considered to prove timely claims." *Lucke v. Multnomah County*, 2008 WL 4372882, at \*23 (D.Or. Sept. 22, 2008).

As argued below, Plaintiff's claims are similarly situated. Evidence of retaliation and discrimination endured by Plaintiff prior to April 25, 2018 may not be directly actionable but it serves as extremely persuasive evidence (particularly when evaluating a summary judgment motion in the light most favorable to the plaintiff) of Defendant's mindset during the conduct that occurred inside the statutory window. Despite the persuasiveness of this conduct and line of reasoning, the District Court did not address it all. Rather, the Court indicated that the doctrine of continuing violations - which Plaintiff only tangentially argued in her Summary Judgment Response - was not applicable in the present case and granted defendant's motion.

However, the *Lucke* case is quite instructive here. In that case, the Court rejected Plaintiff's argument that the continuing violations doctrine should apply by writing, in full:

> Although defendants' acts which form the basis of Lucke's <u>Title VII</u> claim may be related, they are discrete acts, each of which allegedly violated her constitutional rights. Consequently, they do not qualify as a continuing violation. Yet, while time-barred acts may not be considered for purposes of liability, evidence of time-barred acts may be considered to prove timely claims.

Additionally, the Supreme Court has also stated that untimely evidence of an employer's discriminatory acts "may constitute *relevant* background evidence in a

18

proceeding in which the status of a current practice is at issue." *United Air Lines, Inc. v. Evans*, 431 U.S. 553 (1977), (emphasis added and internal quotations omitted). Here, had the district court not simply rejected Plaintiff's pre-April 2018 claims as time barred but rather used the acts to inform its analysis of Plaintiff's claims, the Court should have reached a different conclusion.

## II.    The District Court erred in Granting Defendant's Motion for Summary Judgment on Plaintiff's Disparate Treatment Claims When it Found that Plaintiff had not Demonstrated an Adverse Employment Action.

The district court erred when it granted Defendant's Motion for Summary Judgment by finding that Plaintiff could point to no timely adverse employment action and that Plaintiff could not show a causal connection sufficient to overcome summary judgment. The claims addressed by the district court in this section are claims 1, 2, 4, and 6. Claims 1, 2, and 4 are brought under Oregon State Law and claim 6 is brought under Federal Law.

### A.    Standard of Review

A district court's decision to grant or deny summary judgment is reviewed de novo. *Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004). On review, the appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of

material fact and whether the district court correctly applied the relevant substantive law. *Olsen*, 363 F.3d at 922.

**B.     Argument**

<u>*1. Adverse Employment Action*</u>

The district court erred in ruling that plaintiff did not suffer an adverse employment action. What constitutes an adverse employment action is not mandated under Federal or Oregon Law but instead depends on the context of a case: "Context matters." *Burlington N. & S. F. R. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). The *Burlington* Court also held that adverse employment actions are "employer actions that would have been materially adverse to a reasonable employee." *Id.* Additionally, in the Ninth Circuit, to qualify as an adverse employment action, the action need not be severe. *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003). Rather, the severity of the action ultimately "goes to the issue of damages, not liability." *Aichele v. Blue Elephant Holdings*, LLC, 292 F. Supp. 3d 1104, 1111 (D. Or. 2017) (citation omitted).

In fact, this Court has found that a wide array of disadvantageous changes in the workplace constitute adverse employment actions. While "mere ostracism" by co-workers does not constitute an adverse employment action, *see Strother v. Southern California Permanente Medical Group*, 79 F.3d 859, 869 (9th Cir.1996), a lateral transfer does. In *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir.1987),

the Ninth Circuit held that "[t]ransfers of job duties and undeserved performance ratings, if proven, would constitute adverse employment decisions." (Internal quotations omitted). Similarly, in *St. John v. Employment Development Dept.*, 642 F.2d 273, 274 (9th Cir.1981), this Court held that a transfer to another job of the same pay and status may constitute an adverse employment action.

### 2. *Causation*

The district court erred when in it found that Plaintiff's demotion in April 2018 was not an adverse employment action as a matter of law. Additionally, the district court erred when it found that Plaintiff could not make out a "but for" evidentiary showing on the causation prong of her prima facie case. To establish causation, a Plaintiff must show "by a preponderance of the evidence that engaging in the protected activity was *one of the reasons* for [their] firing and that but for such activity [they] would not have been fired." *Ruggles v. California Polytechnic State Univ.*, 797 F.2d 782, 785 (9th Cir.1986) (quoting *Kauffman v. Sidereal Corp.*, 695 F.2d 343, 345 (9th Cir.1982) (per curiam)).

This Court has long recognized that causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity. See *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir.2000) (noting that causation can be inferred from timing alone); see also *Miller v. Fairchild Indus.*, 885 F.2d 498, 505 (9th Cir.1989) (prima facie

case of causation was established when discharges occurred forty-two and fifty-nine days after EEOC hearings); *Yartzoff*, 809 F.2d at 1376 (sufficient evidence existed where adverse actions occurred less than three months after complaint filed, two weeks after charge first investigated, and less than two months after investigation ended). This approach has been adopted by Courts in Oregon as well, holding that temporal proximity is one way of establishing causation indirectly. See *Huber v. Oregon Dep't. of Educ.*, 235 Or. App. at 241, 230 P.3d 937 (2010) ("close temporal proximity of an employee's engagement in protected activity to termination of employment is circumstantial evidence that the employer had an impermissible motive."). In *Boynton-Burns*, the Oregon Court of Appeals clarified that when relying on temporal proximity alone, "the events must be very close in time." 197 Or. App. at 381.

While Oregon Courts have not explicitly defined what constitutes "very close," they have found that periods of one-two months between the protected activity and termination can be sufficient to defeat a motion for summary judgment. See *Meyer v. Oregon Lottery*, 292 Or. App. 647, 681-82, 426 P.3d 89 (2018)(concluding that a "gap of one to two months between the claimed protected activity and the subsequent adverse action [was] sufficient to raise an issue of fact on causation"). While further evidence regarding each adverse employment actions

22

is set forth below, it is important to reference the above guidelines of temporal proximity when evaluating each adverse action.

### *3. Plaintiff's Adverse Employment Actions*

In her response to Defendant's Motion for Summary Judgment, Plaintiff identified four items, in addition to her termination, that rise to level of an adverse employment action: (1) Demotion, (2) Negative Performance Review, and (3) Offer of Severance. As argued more fully below, the District Court erred when it found that none of these constituted an adverse employment action.

### *Demotion*

Protected Activity: February 25, 2018
Adverse Employment Action: March 26, 2018 (Temporary Demotion) &
April 26, 2018 (Permanent Demotion)

The district court maintains that Plaintiff's demotion cannot be considered an adverse employment action because it was actually a restructuring of Plaintiff's job in the form of an accommodation. This is incorrect, and again a ruling in contravention of taking all facts in the light most favorable to the Plaintiff. A job restructuring does not carry with it the need to rename the position in question. The Court cites to *Maclin v. SBC Ameritech*, 520 F.3d 781, 789 (7th Cir. 2008) in support of its proposition. That case specifically states that a "transfer involving no reduction in pay and no more than a *minor change* in working conditions" can not qualify as an adverse employment action. *Id.* (citation omitted). However, that

same circuit has held that a "materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, *a less distinguished title*, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v. Liberty Nat. Bank and Trust Co. of Indiana* 993 F.2d 132 (7th Cir. 1993) (emphasis added). Here, Plaintiff can show that this demotion was more than a mere change in duties.

First, Plaintiff's title was changed from Supply Chain Manager to Manufacturing Technician. ER-78 through 81. An analysis of these descriptions clearly shows that Plaintiff was moved from a position ostensibly with responsibility and supervisory oversight for a particular department and into one that is simply a technician. This position, by definition, is a less distinguished job title. The Sixth Circuit has also found that a less distinguished job title can form the basis of an adverse employment action. The Sixth Circuit held in *Deleon v. Kalamazoo County Road Com'n*:

> The Commission, and indeed the district court, relied on the proposition that "[r]eassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions." *Kocsis,* 97 F.3d at 885. Nevertheless, a reassignment without salary or work hour changes, however, may be an adverse employment action if it constitutes a demotion evidenced by a "*less distinguished title*, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *White v. Burlington N. & Santa Fe Ry. Co.,* 364 F.3d 789, 795 (6th Cir.2004), *aff'd sub nom. Burlington N. & Santa Fe*

24

*Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (emphasis added).

739 F.3d 914 (6th Cir. 2014). Thus, Plaintiff's "restructuring" as the district court called Plaintiff's demotion, was certainly an adverse employment action.

Second, the district court states that the changes to Plaintiff's job description would have occurred due to Defendant's accommodation of Plaintiff's disability. This is incorrect. Defendant has proffered no reason as to why Plaintiff's title had to change or why her exemption status had to change in order to accommodate her disability.

Third, Plaintiff was previously a salaried employee and was forcibly converted to an hourly employee by Defendant. One of the material conditions of being a salaried employee is not having the typical "clock in, clock out" management of an hourly employment. This made Plaintiff's breaks considerably more difficult to manage. Needing flexibility with her breaks, something specifically requested in the Doctor notes provided to Defendant, was a material term and/or condition of her employment. ER-82 and ER-91. By converting her status to exempt, Defendant set Plaintiff up to fail and overly complicated the break structure knowing that this would cause significant issues for Plaintiff.

Lastly, one month after plaintiff makes a protected complaint -- and two weeks after making a request for an accommodation -- Defendant demoted plaintiff. As argued more fully above, temporal proximity can satisfy the causal

25

prong of Plaintiff's prima facie case, especially when that proximity is close. However, when the temporal proximity is combined with the facts and caselaw above, it becomes clear that Plaintiff's demotion was, indeed, an adverse employment action.

### *Negative Performance Review*

Protected Activity: February 25, 2018
Adverse Employment Action: May 8, 2018

It is well accepted that a negative performance review can constitute an adverse employment action. *See e.g. Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir.1987). In their response to the motion for summary judgment, Defendant relied on *Price v. Wheeler,* 834 Fed. App'x 849 (5th Cir. 2020) and *Lawson v. Reynolds,* 264 Fed. App'x 546 (9th Cir. 2008). However, neither of these cases mirror the facts at hand. In *Lawson*, the Court dealt with an individual who received the "highest or second highest" ratings in question and the Court described that as "somewhat negative." Further, in *Price v. Wheeler,* the review in question was regarding the difference between "Fully Successful" rather than "Outstanding." In the present case, four of Plaintiff's performance reviews are in the record. Three (2015, 2016, and 2017) contain nearly the same language and are quite praiseworthy of Plaintiff's performance. Excerpts of these reviews are provided below:

| Year | Comments |
|------|----------|
| 2015 | "Hui is meticulous about details and follows directions well. She produces reliable results. She greatly improved and grew her interpersonal skills and conflict resolution ability over the last year and should be commended on that.<br><br>*See* ER-106-107 |
| 2016 | Hui is a hard worker prepared to go the extra mile to get job done. She has high perseverance.<br><br>*See* ER-108-109 |
| 2017 | "Hui does a great job running the OE station"<br><br>"Hui was placed on PIP in November 2016 since this time we have seen great improvement."<br><br>"Hui is dedicated and able to focus on the task at hand."<br><br>"Hui does a good job keeping her work space clean."<br><br>*See* ER-110-111 |
| 2018 | "This is an area that Hui has been working to improve. She has been coached..."<br><br>"Seek clarification for end of day priorities."<br><br>"Continue to work on clear communication with lead and manager."<br><br>*See* ER-112-114 |

As can be seen in the above excerpts, Plaintiff's May 8, 2018 performance review was significantly more negative than the reviews given in the past. Not only

did Plaintiff's cumulative "score" on the assessment increase (indicating worse performance) but the language and tone used in the review was significantly more negative. A reasonable employee would view this as retaliation for lodging a protected complaint in February 2018. The May 8, 2018 performance review is thus not analogous to the reviews at issue in either *Lawson* or *Price*. Certainly, any reasonable juror could view this event as an adverse employment action because it was one.

As it relates to Plaintiff's whistle blower retaliation claim (Claim #2, predicated on state law), a plaintiff can establish a causal connection between protected activity and the adverse employment action "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or (2) directly, through evidence of retaliatory animus directed against a plaintiff by the defendant." *Boynton–Burns v. Univ. of Or.*, 197 Or.App. 373, 380–81, 105 P.3d 893 (2005) (emphasis in original, quotation omitted).

Here, Plaintiff makes a successful showing of causation. As argued more fully above, Courts in Oregon have long held that temporal proximity is one way of establishing causation indirectly. See *Huber v. Oregon Dep't. of Educ.*, 235 Or. App. at 241, 230 P.3d 937 (2010) ("close temporal proximity of an employee's

engagement in protected activity to termination of employment is circumstantial evidence that the employer had an impermissible motive.").

In the present case, one month after making the protected complaint, Plaintiff was temporarily demoted and her title and exempt status changed. ER-139. After a one month trial period, this demotion was made permanent on April 26, 2018. *Id.* (we "will 'try out' the restructured position for a period of one month"). Thus, the temporary demotion on March 26, 2018, the demotion being made permanent on April 26, 2018, and the negative performance review can all easily be viewed as retaliatory as well as discriminatory due to Plaintiff's disability. ER-259.

### *Offer of Severance*

Protected Activity: November 1 & 11, 2018
Adverse Employment Action: November 18, 2018

The district court ruled that Plaintiff cannot show that the offer of severance was caused by her disability or other protected class. This ruling is erroneous. While the district court is largely correct that "the mere offer of the severance agreement is insufficient to constitute discrimination in the retaliation context, the crucial word in that sentence is "mere." *See E.E.O.C. v. Nucletron Corp.*, 563 F.Supp.2d 592, (D. Maryland 2008). Here, there are multiple factors that combine to form a convincing adverse employment action.

First, the timing of the offer. Plaintiff made a protected complaint to Neel Dhar on November 1 and 11, 2018. November 1, 2018 is the date that Plaintiff's physician's letter was sent to Defendant. November 11, 2018 This offer was made mere weeks after Plaintiff made a protected communication in reporting Ms. Dayton and Ms. Brown. As cited by the district court, "absent direct evidence of retaliatory intent, causation may be inferred solely from timing when the "adverse employment action follows on the heels of protected activity." *Villiarimo*, 281 F.3d at 1065. The Ninth Circuit has found the following time frames to satisfy the causation element:

1. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1003 (9th Cir. 2009) (two-and-one-half months);

2. *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 929 (9th Cir. 2004) (three months);

3. *Thomas v. City of Beaverton*, 379 F.3d 802, 812 (9th Cir. 2004) (seven weeks);

4. *Miller v. Fairchild Indus.*, 885 F.2d 498, 507 (9th Cir. 1989) (two months).

Here, the fact that the adverse employment action occurred only days after the protected activity, viewed in the light most favorable to Plaintiff, evinces an air of discrimination. Based off of this timing alone, a jury would be allowed to make all reasonable inferences. Including an inference that Plaintiff was fired for her

disability or other protected class. Thus, the district court erred when it found that the offer of severance in this case was not an adverse employment action.

The district court also indicated that Plaintiff cannot provide any evidence to support her claims. However, Plaintiff has provided sworn statements that support her claims. Testimony is evidence.[1] Plaintiff has testified to the following:

> Q. Do you contend that Neel Dhar told you directly in a conversation that the company wanted to let you go because you repeatedly complained is that correct?
>
> A. Correct. Because she said I complain repeatedly, you're not happy, so we're helping you to be happy, so you'll be happy if you go.

ER-174. Plaintiff further conveyed the above sentiment in an email dated November 18, 2018:

> During our phone conversation, you said that my health condition was not a Finisar problem but rather my problem. This is absolutely not correct; the escalation of their misconduct and unchecked by Finisar has significantly damaged my health. I have attached a note regarding this issue from my physician.

Coupled with the above facts, the encouragement to resign given by Neel Dhar is strong evidence of retaliation and discrimination. Further, Plaintiff's understanding of the meeting included Neel Dhar laying the responsibility for this predicament on Hui's disability. ER-260 and ER-94.

---

[1] Testimony is oral or written evidence given by the witness under oath, affidavit, or deposition during a trial or other legal procedures.

Add to the set of facts above as well as the temporal proximity discussed above, an email sent on December 17, 2018 from Sheila Roberts – Defendants' Director of Human Resources. In this email, Ms. Roberts purposely identifies Plaintiff by the most common Chinese given name "Wei" despite the fact that it is well known at this point that Plaintiff's given name is Hui. ER-186. Additionally, in this email Ms. Roberts discusses Plaintiff's disability in a starkly negative way: "See communication Shirley shared below an I also told her that the doctor's note that Wei provided may have come from Tom's wife.[2] If this is the case then we may be able to fight this." ER-186. Two weeks after this email that addressed Plaintiff by a generic Asian name, Defendant's managers had made the decision to terminate Plaintiff. ER-228. This is indicative of the type of behavior employed by Defendants and their employees.

The district court is right that the "mere" offer of severance does not raise the pretext of discrimination. However, (1) the temporal proximity at issue is a matter of days, (2) testimony from the Plaintiff indicates the Defendant raised her disability in their severance communications, (3) Neel Dhar's encouragement that Plaintiff agree to the severance, and (4) racial communications that came only a month after the adverse action clearly show that this was not a "mere" offer of

---

[2] Roberts appears to be referencing the fact that Plaintiff's doctor was the ex-wife of Finisar's former owner.

severance. Clearly, there is more than enough evidence for a jury to conclude that this adverse employment action was taken due to Plaintiff's disability and/or race. Thus, the district court erred in finding that this offer of severance did not constitute an adverse employment action and must therefore be reversed.

## III.    The District Court erred in Granting Defendant's Motion for Summary Judgment when it found that Plaintiff had not suffered from a hostile work environment.

The district court erred when it granted Defendant's Motion for Summary Judgment on Plaintiff's hostile work environment claims. The district court addressed the hostile work environment aspect of claims 1 and 6 in this section and found that Plaintiff did not meet her burden of proof and subsequently dismissed claims 1 and 6.

### A.    Standard of Review

A district court's decision to grant or deny summary judgment is reviewed de novo. *Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004). On review, the appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Olsen*, 363 F.3d at 922.

### B.    Argument

In determining what constitutes a hostile work environment, Courts use a totality of the circumstances test to determine whether a plaintiff's allegations make out a colorable claim of hostile work environment. *See Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). (finding that the working environment must both subjectively and objectively be perceived as abusive). *Harris* lists frequency, severity and level of interference with work performance among the factors particularly relevant to the inquiry. When assessing the objective portion of a plaintiff's claim, Court's assume the perspective of the reasonable victim. *See Ellison v. Brady*, 924 F.2d 872, 879 (9th Cir.1991) ("[A] female plaintiff states a prima facie case of hostile environment sexual harassment when she alleges conduct which a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.").

A single incident of harassment "can support a claim of hostile work environment because the frequency of the discriminatory conduct is only one factor in the analysis," *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 967 (9th Cir. 2002) (internal quotation marks omitted), but for a single incident to suffice, it "must be extremely severe," *Brooks v. City of San Mateo*, 229 F.3d 917, 926 (9th Cir. 2000); *see also Little*, 301 F.3d at 967 (collecting cases). When

severity is questionable, "it is more appropriate to leave the assessment to the fact-finder than for the court to decide the case on summary judgment." *Davis*, 520 F.3d at 1096.

Despite the fact that a single incident of harassment can qualify, the district court did not seriously consider the evidence put forth by Plaintiff. Instead, the court relied on cases cited by defendants in their motion for summary judgment: *Kortan* and *Sanchez*. The court then analogized the present case with those cases and concluded that Plaintiff could not establish a hostile work environment claim. However those cases are incredibly flawed examples to use as a guidepost.

*Kortan v. Cal. Youth Auth* dealt with comments "mainly made in a flurry on February 3rd." *Id.* 217 F.3d 1104, at 1110 (9th Cir. 2000). Additionally, none of the derogatory comments or actions were directed towards the Plaintiff in *Kortan* who even described the alleged harasser as a "perfect gentleman." *Id.* This differs greatly from the case at hand where Plaintiff was the subject of the harassing conduct rather than simply a witness. Additionally, Plaintiff's allegations occurred over a considerable period of time whereas those in *Kortan* were mostly reflected in a single outburst.

In *Sanchez v. City of Santa Ana* a former Santa Ana Police Department Officer who made allegations of a racially offensive cartoon, racially offensive slurs, and that management provided Latino employees with unsafe vehicles and

inadequate police backup. However, by the time the Ninth Circuit addressed the Plaintiff's concerns, his claims had already failed before the Santa Ana Personnel Board, California Superior Court, and the California Court of Appeals. Additionally, outside of the racist cartoon, Plaintiff in *Sanchez* had not provided corroborating evidence of any of his claims.

Additionally, Court's prefer to analyze harassment from the victim's perspective. A complete understanding of the victim's view requires, among other things, an analysis of different perspectives. For example, "conduct that many men consider unobjectionable may offend many women." *See, e.g., Lipsett v. University of Puerto Rico,* 864 F.2d 881, 898 (1st Cir.1988). In analyzing these claims, this dictate should always be heeded.

Here, the harassment and denigration that Plaintiff suffered occurred over a continuous period stretching from 2014 until Plaintiff's termination in 2019. Thus, the severity needed would be significantly less than that described in *Kortan* or *Sanchez*. As the Ninth Circuit has previously held, "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Ellison v. Brady*, 924 F.2d 872, at 878 (9th Cir. 1991). Additionally, in both *Kortan* and *Sanchez,* all or most of the offensive conduct was perpetrated by coworkers. In the present case, the majority

36

of the harassment occurred at the hands of decision makers or supervisors.

Provided below is a table to identify and locate instances of harassing conduct:

| Conduct/Phrase | Date/Speaker | Location in Record |
|---|---|---|
| Liza Dayton, Plaintiff's Lead, calls multiple women "bitch" at a work retirement party. | July, 2017 by Liza Dayton | ER-128 |
| Liza Dayton complains about Plaintiff's high pitched voice: "with her high pitch voice" | February 2017 by Liza Dayton | ER-187 |
| "she have her high pitch of voice." | September 21, 2017 by Liza Dayton | ER-200 |
| "high pitch" | October 17, 2017 by Liza Dayton | ER-206 |
| "she said over and over again with her high voice" | November 3, 2017 by Liza Dayton | ER-209 |
| Plaintiff Makes Protected Complaint and suffers demotion | February 25, 2018- April 26, 2018 | ER-7-25 |
| Plaintiff Receives Most Negative Performance Review to Date | May 8, 2018 | ER-7-25 |
| Plaintiff makes Protected Complaint and Request for Accommodation; Receives offer of Severance | November 1, 2018- November 16, 2018 | ER-7-25 |

Additionally, Defendants characterize Plaintiff as being unable to point to any specific action that occurred "because of" her protected classes. However, Plaintiff has proffered numerous instances of harassment and discrimination that occurred

37

due to her race. Specifically, Plaintiff provides evidence of individuals similarly situated who were nevertheless treated in ways that significantly differed from Defendant's treatment of Plaintiff. For example, in her deposition:

> Q: What information leads you to conclude that you were asked to do remnant packaging *because of* any of your protected classes and/or any opposition or report of allegedly unlawful conduct?

> A: Because the company did not ask anybody else but me to use remnant materials for packaging. And during the same year period when I was doing packaging, there were three other guys. One of them only worked two hours a day, the others worked several hours a day. None of them was asked to use remnant materials.

ER- 180. In fact, Plaintiff frequently complained about being targeted by Defendant. Additionally, as indicated in the table above Lead Dayton has a history of calling female employees "bitch." ER-177. This term is most frequently used as a derogatory term for women. *See Merriam-Webster* (defining bitch as: "a malicious, spiteful, or overbearing woman; and... as a generalized term of abuse and disparagement for a woman.")

On the point of sex discrimination, Lead Dayton also frequently complained to Catherine Brown about Plaintiff's "high pitch" voice. ER-187. Lead Dayton knew the correct phrase for a loud voice. *See generally Id.* (Lead Dayton complaining about "every time she raised her voice"). Despite this knowledge, Lead Dayton characterized the majority of her complaints as relating to the "pitch" of her voice. *Id.* As women – and Plaintiff in particular – have higher pitched

voices, when combined with the other facts, this clearly can support an inference of harassment due to race and/or sex. Thus, the District Court erred in granting Defendant's motion for summary judgment on Plaintiff's hostile work environment claims.

## IV. The District Court Erred in Granting Defendant's Motion for Summary Judgment on Plaintiff's Wrongful Discharge Claims.

The district court erred when it granted Defendant's Motion for summary judgment on Plaintiff's Wrongful Termination claims. In this section, the district court analyzed Plaintiff's claims 3 and 7. The district court incorrectly concluded that Plaintiff has shown no evidence of pretext and therefore her wrongful discharge and retaliatory discharge claims fail. For the reasons set forth below, this is an incorrect ruling and must be reversed.

### A. Standard of Review

A district court's decision to grant or deny summary judgment is reviewed de novo. *Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004). On review, the appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Olsen*, 363 F.3d at 922.

**B.    Argument**

To establish a constructive discharge, a plaintiff must at least show some aggravating factors, such as a continuous pattern of discriminatory treatment. *Schnidrig v. Columbia Machine, Inc.*, 80 F.3d 1406, 1412 (9th Cir.1996); *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir.1987). An employee can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer.

In the context of summary judgment, a plaintiff relying on circumstantial evidence is not required to produce more, or better, evidence than a plaintiff who relies on direct evidence. *Noyes v. Kelly Services*, 488 F.3d 1163, 1170 (2007); *Clemons v. Nike, Inc.*, Slip Copy, 2007 WL 2890972, (September 28, 2007, D.Or., J. King) (citations and quotations omitted). A plaintiff need only produce "sufficient evidence from which the jury could reasonably reject the defendant's explanation." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003).

First, the court argues that Plaintiff cannot show that her wrongful discharge was discriminatory. However, Plaintiff adequately showed that Defendant's proffered reasons for Plaintiff's constructive discharge were wildly inconsistent and therefore not worthy of credence. For example, in her January 3, 2019 email,

40

Neel Dhar explains that "as of 11/19[/18], my understanding was that she is meeting expectations of the tasks assigned to her."ER-185. Defendants contend that Plaintiff had significant performance issues as well as significant issues with supervisors and coworkers. However, barely any of this ever made it into Plaintiff's performance reviews. ER-106-124. Plaintiff's performance reviews are placed in stark contrast to what Defendants now argue. These inconsistent explanations are indicative of pretext. Due to these actions and others taken by Defendants, Plaintiff believed that by January 2019, she was going to be terminated imminently. ER-260. Plaintiff went on leave approximately six weeks later and was subsequently discharged from her employment with Defendants.

As demonstrated and shown more fully in Section III above, Plaintiff was subjected to bullying and harassing conduct at the hands of her coworkers and supervisors. She made multiple protected complaints and was retaliated and/or discriminated against for doing so. This included, as argued above, at least three *timely* adverse employment actions. This conduct lasted for years, included multiple supervisors, and was sufficiently severe and pervasive that it directly led to Plaintiff's discharge.

Lastly, as the district court concluded, the evidence in this case points to the fact that Plaintiff was terminated. Defendant's admitted so in their "termination letter." Order pg. In *Sheets* (overruled on other grounds)*,* the Oregon Supreme

Court held that a discharge can be either actual, as when an employer tells an employee "you're fired," or constructive, as when an employer tells an employee "quit, or you'll be fired." 308 Or. at 226–28, 779 P.2d 1000 (1989). In reaching that conclusion, the court noted that "it would defy both reason and fairness to hold liable an employer who wrongfully discharges an employee but to immunize from liability an employer who, for equally improper reasons, induces an employee to resign rather than be fired." *Id.* Here, Defendant's admitted to terminating Plaintiff who maintains that she was forced to resign, or constructively discharged. The fact that they ultimately labeled her discharge a resignation does not transform Defendant's choice into Plaintiff's voluntary action. Defendant's made the choice to terminate Plaintiff's employment. In essence, they said "quit, or you'll be fired." *Id.*

## V.  The District Court erred in Granting Defendant's Motion for Summary Judgment on Plaintiff's Disability Claims.

The district court erred when granted summary judgment on Plaintiff's disability claims (3 and 7). Claim 3 is premised on Oregon State Law and claim 7 is brought under Federal law. Specifically, the district court erred by concluding that (1) Plaintiff was not disabled and (2) that Plaintiff had not suffered an adverse employment action as it relates to her disability. For the reasons put forth below, these conclusions were in error.

### A.    Standard of Review

A district court's decision to grant or deny summary judgment is reviewed de novo. *Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 922 (9th Cir. 2004). On review, the appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Olsen*, 363 F.3d at 922.

### B.    Argument

#### *1. Plaintiff's Disability*

The Equal Employment Opportunity Commission ("EEOC") has issued regulations defining the three elements of disability contained in subsection (A). *See* 29 C.F.R. § 1630.2 (2012). Those elements are: (1) a physical or mental impairment; (2) that affects a major life activity; (3) and whose effects substantially limit that activity. *See id.*; *accord Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (directing district courts to perform three step inquiry to assess whether a particular condition constitutes a disability). Relevant here, the EEOC defines a major life activity as follows: seeing, reading, communicating, interacting with others, working, and the operation of a major bodily function such as special sense organ. *See* 29 C.F.R. § 1630.2 (2012). Further, the EEOC expended considerable effort in 29 C.F.R. § 1630.2 explaining

43

that the phrase "substantially limits" is not an onerous standard to meet. *Id.* ("substantially limits shall be construed broadly" and it is "not meant to be a demanding standard").

To be substantially limited in the major life activity of working, a plaintiff in an action under the Americans with Disabilities Act (ADA) must show that they are precluded from a substantial class of jobs or a broad range of jobs. *E.E.O.C. v. United Parcel Service, Inc.*, 424 F.3d 1060, (9th Cir. 2005). Here, Plaintiff's highest performance reviews were for her work on Optical Efficiency. Due to her ocular disability and subsequent limitations, Plaintiff is precluded largely from the entire class of jobs that require good working vision. Lafky decl. Exhibit #5 and 7. Thus, under the current law Plaintiff's major life activity of working was substantially limited by her disability.

Plaintiff is also limited in the ability to use her eyes in the way members of the general population might. This substantially limits the major life activities of (1) seeing, (2) reading ("A. I would need a magnifying glass; for example, looking at the dictionary"). ER-180. Lastly, the eye is considered a "special sense organ" and Plaintiff's numerous ocular conditions (cataracts, lazy eye, and dry eye) result in substantial impairment. ER-82-85.

Here, the district court never fully contended with the sources cited by Plaintiff and instead concluded that "Plaintiff provides no evidence that her lazy

eye impacts her ability to perform activities of daily living, such as seeing, reading, or concentrating." ER-7-31. However, the district court's order completely ignores that Plaintiff testified specifically about the way her disability might limit her daily life ("A. I would need a magnifying glass; for example, looking at the dictionary"). ER-174. This alone would substantially limit Plaintiff's life activity of reading (as well as seeing) which the EEOC specifically delineates as a major life activity. Additionally, Plaintiff's doctors wrote notes to Defendant and their agents specifically describing her medical condition and treatment. Plaintiff's testimony, doctor's notes, and the fact that Defendant regarded her as disabled (by furnishing some of her requested accommodations). ER-11 and ER-13. These facts, coupled with the liberal "substantially limits" standard encouraged by the EEOC, it is clear that Plaintiff is disabled under current case law. This is another example of the district court not construing the facts in the light most favorable to the Plaintiff in making a "legal" ruling. The district court's ruling is therefore incorrect and must be reversed.

Regarding whether Plaintiff suffered from an adverse employment action, this argument is more fully briefed in section II and IV above.

### *2. Defendant's Failure to Accommodate*

Defendants claimed, and the district court concluded as a matter of law, that Defendant had furnished every accommodation requested. This is erroneous.

First, the Doctor notes that were provided to Defendant indicated that Plaintiff needed to take frequent breaks. ER11 and ER-13. This was a known issue by Defendants. ER-128 ("She is under the care of a doctor for her eye. Which requires her to put ointment in the eye outside of the manufacturing area"). Due to this well known issue, Plaintiff asked to be accommodated in a July 27, 2017 email to Gil Cohen. Plaintiff asked that she be allowed to structure her breaks to "reduce the chance of unnecessary conflict with Liza." ER-94.

Defendant never accommodated Plaintiff when she initially requested this and Defendants continued to deny this request as evidenced in the email memorializing Plaintiff's demotion on March 26, 2018. ER-139. Despite Plaintiff's Doctor's note and need for this accommodation, Defendant continued to deny it and harass Plaintiff over her break habits. ER-145 and ER-187. In fact, in a December 20, 2018 email Jessica Pastor (one of Defendant's HR personnel) wrote:

> She said that Casey Frey, Hui's new Lead is holding her to the schedule established *for all Technicians* and she doesn't like it but has been following it recently. Looks like it is working. *Catherine also brought up breaks during their weekly staff meeting to ensure EVERYONE was on the same page on the expectation as it pertains to breaks* and used the reason that they have high production demands and we need to ensure the focus is on getting the work done and not extending break times or lunch.

ER-185. Not only does this email demonstrate that Defendant's staff were holding Plaintiff to the schedule established for all technicians (and therefore not a personal accommodation for Hui) but they are also discussing Plaintiff's supervisor singling

46

Plaintiff out in front of her coworkers and colleagues. This lends credence to Plaintiff's argument that Defendant did not accommodate all of the requests that Plaintiff made.

Second, the Doctor's note provided in October 2018 detailed Plaintiff's high blood pressure and connected it to her employment stress. ER-13. Plaintiff's November 1, 2018 doctor's note indicated that Plaintiff was suffering from depression with anxiety, hypertension, shingles. *Id.* Plaintiff's doctor even suggested a reasonable accommodation of transferring positions or receiving a new supervisor. *Id.* Neel Dhar indicated in her January 3, 2019 email that she denied Plaintiff's request for reasonable accommodation. ER-185 ("I have already denied her request for reasonable accommodation which was basically to change her Supervisor").

Defendant's argued, and the court agreed, that Plaintiff's reasonable accommodation request was for a new supervisor which is per se unreasonable. ER-7. However, while the direct changing of a supervisor may be per se unreasonable, this was only part of the request. The November 1, 2018 letter indicated that Plaintiff should seek another position due to the work related stress exacerbating her anxiety, depression, shingles, and other health issues. Transfers to other positions can clearly be reasonable. *See US Airways, Inc. v. Barnett* 535 U.S. 391 (2002) (holding that the ADA provisions state "reasonable accommodation

may include reassignment to a *vacant* position." § 12111(9)(B)). Despite this, there is no evidence that the Defendant followed up on a possible transfer or otherwise worked with Plaintiff to find new accommodations that would enable her to adequately do her job. Due to these facts, a reasonable juror could certainly conclude that Plaintiff was not reasonably accommodated by Defendant.

## VI. The District Court erred in Granting Defendant's Motion for the Imposition of Sanctions.

The district court erred when it granted Defendant's Motion for the Imposition of Sanctions. Defendant filed a motion for the recovery of costs and fees (which the court more accurately described as a motion for imposition of sanctions). In the motion, Defendants

### A. Standard of Review

A district court's decision to grant or deny or deny sanctions is reviewed for abuse of discretion. *See Kapco Mfg. Co. v. C & O Enters., Inc.,* 886 F.2d 1485, 1491 (7th Cir.1989). On review, the appellate court "need only inquire whether any reasonable person could agree with the district court's sanction award." *Id.*

### B. Argument

In its order. the district court gave multiple reasons for imposing sanctions on Plaintiff. Namely, that (1) Plaintiff's conduct was intentional and not a good

48

faith mistake and (2) Plaintiff's Counsel was not entitled to rely on Plaintiff's representations regarding discovery.

### 1. Plaintiff's Counsel Was Entitled to Rely on Plaintiff's Representations

The district court held that Plaintiff's counsel was not entitled to rely on the representations of Plaintiff during the discovery process. Here, as argued more fully below, Plaintiff was acting in good faith and therefore Plaintiff's counsel could not mistakenly rely on that notion. While it is true that FRCP 26(g)(2) places a requirement on an attorney or a party to certify that every discovery response or objection "to the best of the signer's knowledge, information, and belief, formed after a reasonable inquiry, is consistent with the Federal Rules of Civil Procedure and warranted by existing case law." *Id.* However, Defendant's argument that counsel cannot rely on their client's representations is misplaced. Specifically, the advisory notes to Rule 26 provide a different analysis. As relevant here:

> the duty to make a "reasonable inquiry" is satisfied if the investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances. It is an objective standard similar to the one imposed by Rule 11. See the Advisory Committee Note to Rule 11. *See also Kinee v. Abraham Lincoln Fed. Sav. & Loan Ass'n*, 365 F.Supp. 975 (E.D.Pa.1973). In making the inquiry, *the attorney may rely on assertions by the client* and on communications with other counsel in the case as long as that reliance is appropriate under the circumstances. Ultimately, what is reasonable is a matter for the court to decide on the totality of the circumstances.

Rule 26 Advisory Committee Notes 1983 (emphasis added). Here, Defendants have produced no evidence to indicate that Counsel's reliance was unreasonable.

Counsel's declaration indicates that he never felt that Plaintiff was willfully or intentionally withholding any relevant information. Lafky decl. ¶ 3. Further, the advisory notes to Rule 26 also indicate that:

> "Rule 26(g) does not require the signing attorney to certify the truthfulness of the client's factual responses to a discovery request. Rather, the signature certifies that the lawyer has made a reasonable effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand. Thus, the lawyer's certification under Rule 26(g) should be distinguished from other signature requirements in the rules, such as those in Rules 30(e) and 33.

Thus, Counsel could not have mistakenly relied on Plaintiff's assertions as that is explicitly allowed by the rules of evidence. Additionally, no evidence has been produced showing that Plaintiff's counsel knew about Plaintiff's communications with her deceased sister or her communications with Mr. Mossberg.

## *2. Plaintiff Acted in Good Faith*

The district court cites frequently to the fact that Plaintiff did not produce emails and other documents sent to her now deceased sister. However, at the time they were requested, these communications were multiple years old. Plaintiff also explained to the court that she did not understand that private communications with her sister were relevant regardless of their content. ER-274. The failure to produce these documents was taken as evidence of Plaintiff's bad faith. However, when Defendant's wanted to obtain a forensic examination of Plaintiff's computer and email accounts, Plaintiff readily complied. Plaintiff surely knew that all of those

documents were going to be discovered by Defendants. Despite this, no information has been provided showing that Plaintiff deleted these emails or otherwise attempted to hide these emails. This is strong evidence of confusion or mistake rather than bad faith.

The district court further argued that Plaintiff's urging to Mr. Mossberg to withhold the information regarding her sister fails to find purchase. The communication that was sent to Mr. Mossberg was "[Defense counsel] did not know and did not ask me how I learned about the job opening at Lightsmyth. Therefore, I beg you, please avoid mentioning [Diana's] name to them." ER-262. However, neither the Defendant nor the Court articulated why Plaintiff would want to keep Diana's name out of the lawsuit. The court's speculation is that Plaintiff desired to keep Diana's name out of the lawsuit to prevent those communications from being turned over to the Defendant. However, to the extent that Plaintiff sent emails to her sister complaining about her employment, she also sent emails to Defendants' principals and managers making similar complaints. Additionally, Plaintiff did not want defense counsel to bring Diana up during deposition and further hurt Plaintiff who had lost her sister. While Plaintiffs' complaints to her sister might be relevant to show the extent of Plaintiff's non-economic damages, they were not some smoking gun that Plaintiff was withholding. The evidence

presented to the district court in response to the motion for imposition of sanctions was significant and shows that Plaintiff was acting in good faith.

Additionally, the central requirement of Rule 37 is that "any sanction must be just." *Insurance Corp. v. Compagnie des Bauxites de Guinée*, 456 U.S. 694, 707, 102 S.Ct. 2099, 2106, 72 L.Ed.2d 492 (1982). Thus, Rule 37 sanctions are bounded by the "concept of proportionality between offense and sanction." *Bonds v. District of Columbia*, 93 F.3d 801, 808 (D.C. Cir. 1996) (internal citations omitted). Due to the reasons discussed previously, any sanction here would be manifestly unjust and would not be proportional to any alleged discovery violation. However, even if this court is persuaded by the district court's arguments, monetary sanctions in a case like this are clearly unwarranted. The district court abused its discretion and the order of sanctions should be reversed.

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that this Court reverse the district court's judgment and remand the case for further proceedings.

Date: October 25, 2023.

LAFKY & LAFKY

*/s Kevin T. Lafky*
Kevin T. Lafky, OSB #852633
Attorney for Appellant Hui Xu

## STATEMENT OF RELATED CASES
## PURSUANT TO CIRCUIT RULE 28-2.6

The undersigned attorney states the following:

[X] I am unaware of any related cases, as defined by Fed. R. App. P. 28-2.6, currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

Date: October 25, 2023.

LAFKY & LAFKY

*/s Kevin T. Lafky*
Kevin T. Lafky, OSB #852633

42

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,292 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point font.

Date: October 25, 2023.

LAFKY & LAFKY

*/s Kevin T. Lafky*
Kevin T. Lafky, OSB #852633

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2023, I electronically filed the foregoing with the Clerk for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. All participants in this case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Date: October 25, 2023.

LAFKY & LAFKY

*/s Kevin T. Lafky*
Kevin T. Lafky, OSB #852633