**No. 23-35423**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

HUI XU,

*Plaintiff-Appellant*,

v.

LIGHTSMYTH TECHNOLOGIES, INC., *a Delaware Corporation*,
and FINISAR, *a Delaware Corporation*,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Oregon, Eugene Division
No. 6:20-cv-01201-MC
Hon. Michael McShane

_____

**ANSWERING BRIEF OF DEFENDANTS-APPELLEES**

_____

John A. Berg, OSB No. 120018
Christine E. Sargent, OSB No. 172189
LITTLER MENDELSON P.C.
1300 SW 5th Ave
Wells Fargo Tower - Ste 2050
Portland, OR 97201
(503) 221-0309
jberg@littler.com
csargent@littler.com

*Attorneys for Defendants-Appellees*
Lightsmyth Technologies, Inc. and Finisar

# DISCLOSURE STATEMENT

In accordance with Circuit Rule 26.1, Defendants-Appellees Lightsmyth Technologies, Inc. and Finisar Corporation (incorrectly sued as Finisar) state that they are nongovernmental entities. Defendant-Appellee Lightsmyth Technologies, Inc. is a wholly-owned subsidiary of Defendant-Appellee Finisar Corporation. Defendant-Appellee Finisar is a wholly-owned subsidiary of Coherent Corp. (f/k/a II-VI Incorporated). Coherent Corp. is publicly-traded: (COHR:NYSE).

Date:  January 25, 2024

LITTLER MENDELSON P.C.

*/s/ John A. Berg*
John A. Berg, Bar No. 120018
Christine E. Sargent, Bar No. 172189

*Attorneys for Defendants-Appellees*
*Lightsmyth Technologies, Inc. and Finisar*

i

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ................................................................. i

TABLE OF CONTENTS......................................................................... ii

TABLE OF AUTHORITIES ..................................................................v

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ........................................................2

ISSUES PRESENTED.............................................................................2

STATEMENT OF THE CASE.................................................................3

    I.     June 2016: Finisar assigns Xu to report to Brown. ...............................7

    II.    October 2016: Finisar consolidates inventory control responsibilities under new position. .................................................................9

    III.   April 2017: Xu requests accommodation for an eye condition. .........10

    IV.   March 2018: Xu triggers an HR investigation. ...................................11

    V.    March 26, 2018: Xu requests and receives a second accommodation for her eye condition...............................................................12

    VI.   May 8, 2018: Xu receives 2018 annual performance review. ...........12

    VII.  November 16, 2018: Finisar offers Xu the choice of severance.........13

    VIII. March 24, 2019: Xu notifies Finisar that she would not be returning to work after *un*protected personal leave. ...............................14

    IX.   April 25, 2019: Xu files a belated BOLI Charge lacking evidentiary support. ............................................................................16

PROCEDURAL HISTORY & RULINGS PRESENTED FOR REVIEW.............16

SUMMARY OF THE ARGUMENT ....................................................17

STANDARD OF REVIEW ...............................................................18

ARGUMENT .................................................................................19

I.    The District Court properly granted summary judgment...................19

      A.    The applicable statutes of limitations bar Xu's claims of
            disparate treatment occurring prior to April 25, 2018. .............19

      B.    Xu's disability accommodation claim fails for multiple reasons.
            ...................................................................................22

      C.    The District Court correctly dismissed Xu's claims relating to
            disparate treatment allegedly occurring after April 25, 2018...26

            1.    The District Court applied the correct standards for
                  adverse actions..............................................26

            2.    Xu's specific allegations of disparate treatment uniformly
                  fail. ...............................................................27

      D.    Xu's hostile work environment claim fails as a matter of law. 46

      E.    Xu's wrongful termination fails as a matter of law. .................50

            1.    Constructive Discharge...................................50

            2.    Actual Termination.........................................53

II.   In issuing the Sanctions Order, the District Court exercised its
      discretion without error, let alone abuse .............................54

      A.    Xu's counsel mistakenly relied on their client to act in good
            faith. ............................................................................55

      B.    Xu's own misconduct could not have been unintentional........58

      C.    The District Court properly ordered Xu to bear the cost of her
            own discovery misconduct......................................................59

CONCLUSION ....................................................................................62

STATEMENT OF RELATED CASES ...................................................65

CERTIFICATE OF COMPLIANCE WITH WORD LIMIT AND FORMAT REQUIREMENTS.........................................................................66

CERTIFICATE OF SERVICE ..............................................................67

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3E Mobile, LLC v. Global Cellular, Inc.*,
  222 F. Supp. 2d 50 (D.D.C. 2016) ....................................................63

*Abadia-Peixoto v. U.S. Dep't of Homeland Sec.*,
  Case No. 11-cv-04001 RS (KAW), 2013 WL 4511925 (N.D. Cal.
  Aug. 23, 2013) ................................................................................56

*Abramson v. Univ. of Hawaii*,
  594 F.2d 202 (9th Cir. 1979) ...........................................................30

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .........................................................................19

*Bahri v. Home Depot USA, Inc.*,
  242 F. Supp. 2d 922 (D. Or. 2002) ..................................................49

*British Airways Bd. v. Boeing Co.*,
  585 F.2d 946 (9th Cir. 1978) ...........................................................23

*Brooks v. City of San Mateo*,
  229 F.3d 917 (9th Cir. 2000) ...........................................................52

*Brown v. SSA Atlantic, LLC*,
  No. CV419-303, 2021 WL 1015891 (S.D. Ga. Mar. 15, 2021) ........58

*Butler v. City of Eugene,*
  *Or.,* F. Supp. 2d 1100, 1104 (D. Or. 2010) ......................................21

*Calvert v. Red Robin Intern., Inc.*,
  Case No. 11-03026, 2012 WL 1668980 (N.D. Cal. May 11, 2012) .................57

*Carroll v. Holder*,
  Civ. No. 09-3093-CL, 2011 WL 7091804 (D. Or. Sept. 30, 2011) .............51, 53

*CAT3, LLC v. Black Lineage, Inc.*,
  164 F. Supp. 3d 488 (S.D.N.Y. 2016) ..............................................63

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ..................................................................18

*Chamat v. Geithner*,
    381 Fed. App'x 728 (9th Cir. 2010) .......................................47

*Cherkaoui v. City of Quincy*,
    877 F.3d 14 (1st Cir. 2017) ................................................36, 39

*Chuang v. Univ. of Cal. Davis Bd. of Trustees*,
    225 F.3d 1115 (9th Cir. 2000) ................................................26

*Collins v. Kimberly-Clark Pennsylvania, LLC*,
    247 F. Supp. 3d 571 (E.D. Penn 2017) .................................38

*Davis v. Wal-Mart Stores, Inc.*,
    Case No. CV-09-1488-HU, 2011 WL 2729238 (D. Or. May 3,
    2011) ........................................................................................25

*Delaware State Coll. v. Ricks*,
    449 U.S. 250, 258-59 (1980) .................................................30

*Doe v. Purdue Univ.*,
    Case No. 2:17-cv-33-JPK, 2021 WL 2767405 (N.D. Ind. July 2,
    2021) ........................................................................................57

*DR Distributors, LLC v. 21 Century Smoking, Inc.*,
    513 F. Supp. 3d 839 (N.D. Ill. 2021) ....................................57

*Dunlap v. Liberty Natural Products, Inc.*,
    Case No. 3:12-cv-01635-SI, 2015 WL 1778477 (D. Or. Apr. 20,
    2015) ........................................................................................25

*E.E.O.C. v. Nucletron Corp.*,
    563 F. Supp. 2d 592 (D. Md. 2008) ......................................44

*E.E.O.C. v. Sundance Rehabilitation Corp.*,
    466 F.3d 490 (6th Cir. 2007) .................................................45

*Edwards v. Rochester Inst. of Tech.*,
    Case No. 10-CV-6553-FPG, 2018 WL 1569357 (W.D.N.Y. Mar.
    29, 2018) ..................................................................................34

*Franklin v. Nike, Inc.*,
    Case No. CV-07-1667-PK, 2009 WL 6048126 (D. Or. Nov. 13,
    2009) ................................................................................................40

*Goodman v. Staples The Office Superstore, LLC*,
    644 F.3d 817 (9th Cir. 2011) ................................................................19

*Goodyear Tire & Rubber Co. v. Haeger*,
    581 U.S. 101, 137 S. Ct. 1178 (2017)..........................................60, 61

*Halaco Eng'g Co. v. Costle*,
    843 F.2d 376 (9th Cir. 1988) ...............................................................19

*Hall v. N. Am. Van Lines, Inc.*,
    476 F.3d 683 (9th Cir. 2007) ...............................................................19

*Hill v. American General Finance, Inc.*,
    218 F.3d 639 (7th Cir. 2000) ...............................................................34

*Hubbard v. Bimbo Bakeries USA, Inc.*,
    Civ. No. 06-43-JE, 2006 WL 2863222 (D. Or. Oct. 4, 2006) ............49

*Jackson v. Nassau Cty.*,
    CV 18-3007 (JS), 2022 WL 1460241 (E.D.N.Y. May 9, 2022) .........63

*Jones v. Bremen High School Dist. 228*,
    Case No. 08 C 3548, 2010 WL 2106640 (N.D. Ill. May 25, 2010) ....56

*Kakenowash v. Wilkie*,
    Civ. No. 1:19-cv-00019-MR-WCM, 2020 WL 106031 (W.D.N.C.
    Mar. 4, 2020)........................................................................................46

*Kortan v. Cal. Youth Auth.*,
    217 F.3d 1104 (9th Cir. 2000) .............................................................49

*Laird v. Fairfax Cty., VA*,
    978 F.3d 887 (4th Cir. 2020) ..........................................................37, 39

*Lawson v. Reynolds*,
    264 Fed. App'x 546 (9th Cir. 2008) .....................................................42

*Lee v. Trees, Inc.*,
    No. 3:15-cv-0165, 2017 WL 5147146 (D. Or. Nov. 6, 2017)..............58

*Liberty Nat'l Bank and Trust Co. of Indiana*,
993 F.2d 132 (7th Cir. 1993) ............................................................... 33

*Lipsett v. Univ. of Puerto Rico*,
864 F.3d 881 (1st Cir. 1988) ................................................................ 49

*Lucke v. Multnomah Cty.*,
Case No. CV-06-1149-ST, 2008 WL 4372882 (D. Or. Sept. 22,
2008) ................................................................................................... 20

*Maclin v. SBC Ameritech*,
520 F.3d 781 (7th Cir. 2008) ......................................................... 32, 33

*Manatt v. Bank of Am.*,
339 F.3d 792 (9th Cir. 2003) ............................................................... 49

*McFadden v. Meeker Housing Authority*,
Civ No. 16-cv-2304-WJM-GPG, 2018 WL 3348882 (D. Colo. July
9, 2018) ............................................................................................... 61

*McGanty v. Staudenraus*,
321 Or. 532 (1995) ............................................................................. 52

*Mercer v. Cook Cty., Ill.*,
527 Fed App'x 515 (7th Cir. 2013) ..................................................... 50

*Montero v. AGCO Corp.*,
192 F.3d 856 (9th Cir. 1999) ............................................................... 53

*Moreno–Rivera v. DHL Global Forwarding*,
762 F. Supp. 2d 397 (D.P.R. 2011) ..................................................... 34

*Muldrow v. City of St. Louis*,
143 S. Ct. 2686 (2023) ........................................................................ 26

*Mundy v. Household Finance Corp.*,
885 F. 2d 542 (9th Cir. 1989) ............................................................. 46

*Murray v. City of Winston-Salem, NC*,
203 F. Supp. 2d 493 (M.D.N.C. 2002) ............................................... 35

*Nat'l R.R. Passenger Corp. v. Morgan*,
536 U.S. 101, 110 (2002) .................................................................... 21

*Noonan v. Consolidated Shoe Company, Inc.*,
   84 F.4th 566 (4th Cir. 2023) ...............................................................33

*Phillips v. Leggett & Platt, Inc.*,
   658 F.3d 452 (5th Cir. 2011) ..............................................................30

*Poland v. Chertoff*,
   494 F.3d 1174 (9th Cir. 2007) ............................................................53

*Price v. Wheeler*,
   834 Fed. App'x 849 (5th Cir. 2020) ....................................................42

*Roberts v. Permanente Med. Grp.*,
   690 Fed. App'x 535, 536 (9th Cir. 2017) ...........................................23

*Ryan v. Patterson Dental Supply, Inc.*,
   Case No. CV-98-1177-ST, CV-98-1177-HA, 2000 WL 640859 (D.
   Or. May 12, 2000)...............................................................................51

*Sanchez v. City of Santa Ana*,
   936 F.2d 1027 (9th Cir. 1990) ............................................................50

*Sanders v. BNSF Ry. Co.*,
   Case No. 17-cv-5106, 2019 WL 5448309 (D. Minn. Oct. 24, 2019)...............38

*Serrano-Cruz v. DFI Puerto Pico, Inc.*,
   109 F.3d 23 (1st Cir. 1997)..................................................................54

*Sessoms v. Trustees of Univ. of Penn.*,
   739 Fed. App'x 84 (3d Cir. 2018) .......................................................46

*Shiban v. Intel Corp.*,
   Case No. CV 00–401–PHX–PGR, 2002 WL 31371971 (D. Ariz.
   Mar. 28, 2002)....................................................................................31

*Steiner v. Showboat Operating Co.*,
   25 F.3d 1459 (9th Cir. 1994) ..............................................................53

*Thompson v. Secretary, U.S. Dep't of Veterans Affairs*,
   801 Fed. App'x 688 (11th Cir. 2020) ..................................................33

*Tu v. Kaiser Foundation Health Plan of NW*,
   Civ. No. 07-968-KI, 2008 WL 3871742 (D. Or. Aug. 19, 2008).......................21

ix

*Vasquez v. Cty. of Los Angeles*,
   349 F.3d 634 (9th Cir. 2003) ...............................................................................18

*Williams v. State Farm Fire and Casualty Co.*,
   Case No. 1:17-cv-1147-RJJ-PJG, 2019 WL 6036808 (W.D. Mich.
   Nov. 14, 2019) .......................................................................................................61

*Zubulake v. UBS Warburg LLC*,
   229 F.R.D. 422 (S.D.N.Y. 2004) .......................................................................57

**Statutes**

28 U.S.C. § 1291 .............................................................................................*passim*

28 U.S.C. § 1331 ........................................................................................................2

28 U.S.C. § 1367 ........................................................................................................2

29 U.S.C. 623 ...........................................................................................................17

29 U.S.C. 626(d) .....................................................................................................19

38 U.S.C. § 4323(b)(3).............................................................................................2

42 U.S.C. 2000e-2 ...................................................................................................16

42 U.S.C. 2000e-5(e)(1)..........................................................................................19

42 U.S.C. 12112 .......................................................................................................16

ADA .................................................................................................................20, 46

ADEA.........................................................................................................................31

FMLA.........................................................................................................................54

ORS 653.060(a) .......................................................................................................17

ORS 659A.030(1)(a) and (b) ...............................................................................16

ORS 659A.030(1)(f) ...............................................................................................16

ORS 659A.112 .........................................................................................................16

ORS 659A.199 .........................................................................................................16

ORS 659A.875(1)(a) ................................................................................ 19

**Other Authorities**

FRCP 56(c) ............................................................................................ 18

FRCP 37 ................................................................................................. 63

Rule 26 ........................................................................................ 56, 58, 63

Rules 34 ................................................................................................. 56

**INTRODUCTION**

Plaintiff-Appellant Hui Xu ("Xu") took a "kitchen sink" approach to this lawsuit. Careful to not exclude any perceived mistreatment from her lengthy employment, Xu alleges that a group of no less than eight former colleagues subjected her to miscellaneous occurrences of unfair conduct over a period of approximately *seven* years, all based on five different protected classes. She asserts three different theories: disparate treatment, hostile work environment and failure to accommodate, and spreads multiple claims among them. On May 25, 2023, the District Court correctly found the majority of her claims time-barred and concluded that no reasonable jury could find in Xu's favor on any one of her timely theories and claims ("Summary Judgment Order").

Months earlier, the District assessed the conduct of Xu during the course of discovery pursuant to Finisar's Motion for Recovery of Fees and Costs Resulting from Plaintiff's Discovery Misconduct ("Sanctions Motion"). For the Court's consideration, Defendants-Appellees provided a detailed history of Xu's willful discovery obstruction and non-compliance over several months. On February 27, 2023, the District Court carefully and properly exercised its discretion to sanction Xu by requiring her to reimburse Defendants-Appellees for the reasonable fees and costs arising from her abusive discovery practices ("Sanctions Order").

This Court should affirm both orders.

1

## JURISDICTIONAL STATEMENT

Defendants-Appellees Lightsmyth Technologies, Inc. ("Lightsmyth") and Finisar (collectively "Finisar") contest neither the District Court's jurisdiction pursuant to 28 U.S.C. § 1331, 38 U.S.C. § 4323(b)(3), and 28 U.S.C. § 1367, nor this Court's jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.    Whether the District Court properly granted summary judgment, based on the applicable statutes of limitation, in relation to Xu's claims alleging disparate treatment prior to April 25, 2018.

2.    Whether the District Court properly granted summary judgment on Xu's disability accommodation claim where Xu admittedly suffered from no disability and received every reasonable accommodation she requested.

3.    Whether the District Court properly granted summary judgment on Xu's timely disparate treatment claims for retaliation and race, national origin, age, and gender discrimination based on the absence of any adverse action(s) or, alternatively, the lack of sufficient evidence to create an inference of either a causal connection or a nexus to any protected class.

4.    Whether the District Court properly granted summary judgment on Xu's hostile work environment theory on the basis that the allegedly hostile

treatment was neither severe nor pervasive, nor "because of" any of her protected classes, so as to rise to the level of an actionable hostile work environment.

5. Whether the District Court properly granted summary judgment on Xu's wrongful discharge claim as a result of Xu's failure to support either a constructive discharge theory (requiring objectively intolerable working conditions) or a wrongful termination theory (requiring an inference of pretext).

6. Whether the District Court abused its discretion by issuing its Sanctions Order based on the detailed record of Xu's willful discovery misconduct.

## STATEMENT OF THE CASE

In January 2012, LightSmyth's now-former founder Tom Mossberg arranged a Manufacturing Technician job for Xu, the sister of a former girlfriend of his. *See* 2-SER-131; 2-SER-250-254. Within a few months, Mossberg changed Xu's title to Supply Chain Manager despite her relative inexperience in the field. *See* 2-SER-132, 137-140; 2-SER-259-262. Two years later, on May 26, 2014, Finisar acquired LightSmyth and continued Xu's at-will, nonsupervisory employment with the same title. *See* 2-SER-126-127, 141; 2-SER-268; *see also* 2-SER-128-129. Alleged wrongdoers Catherine Brown ("Brown"), Dimitri Iazikov ("Iazikov"), and Gil Cohen ("Cohen") were all involved in these *favorable* employment decisions with full knowledge of Xu's protected classes (*i.e.*, race,

national origin, gender, and age). *See* 2-SER-130-131, 135-136, 159-160; 2-SER-278-279, 289; 2-SER-255.

At the time of hire, Xu acknowledged the at-will nature of her employment, and understood that it could be terminated at any time, with or without cause. *See* 2-SER-127; 2-SER-291. She also received a copy of Finisar's Employee Handbook and agreed in writing to abide by its policies. *Id.*; 2-SER-161-165. Among its policies, Finisar prohibits discrimination and harassment of all kinds. 3-SER-301-304. To this end, Finisar encourages the reporting of improper, inappropriate, and unlawful conduct to Human Resources and management, and prohibits retaliation against the individual reporting it. *Id.*

From the beginning and throughout her employment, Xu utilized these policies by consistently and repeatedly reporting disagreements of all varieties, no matter how trivial. *See* 2-SER-172 (estimating that she complained of alleged unlawful conduct 80-100 times throughout her employment). For example, Xu reported the following events as "defamatory" and/or instances of supervisor(s) fabricating facts:

- In August 2014, Xu accused Brown of lacking "competen[ce] to make reasonable or correct quality control decision[s]," and explained that "[f]reedom of speech entitles everybody to state their opinion or decision,

but nobody should twist fact[s] or make up stories especially when we discuss work issue of quality control." 3-SER-317.

- In February 2017, Xu alleged that Brown had "attacked [Xu's] heart and good intention" when Brown reminded Xu that she needed to follow her lead's instruction and verify that [certain materials] had been properly tested. 3-SER-319; 2-SER-199-204.

- In April 2018, Xu "was shocked" and felt "extremely intimidated" by the alleged "unrealistic portrayal of the events" relayed through Iazikov's comment during a meeting that, "[d]uring [a] two and a half hour" period, Xu "only packaged 9 gratings." 3-SER-325; 2-SER-207-210.

- In November 2018, Xu vaguely characterized her work environment as including "character defamation" following a discussion with Senior HR Manager Neel Dhar ("Dhar"), during which Xu requested a new supervisor. 3-SER-327; 2-SER-232-233.

Xu reported the following events as "hostile," "offensive" and/or "harassment:"

- On September 19, 2016, Xu proclaimed that Brown "hurt" her when Brown declined to grant her a security pass to enter the facility outside a 12-hour period encapsulating business hours. 3-SER-328 ("I am sad and deeply hurt."); 3-SER-332 ("It is unfair and unreasonable for you to question my heart and my integrity. You hurt me."); 2-SER-285-286.

5

- On November 14, 2016, Xu reported that Cleanroom Lead Liza Dayton ("Dayton") had "insulted and harassed" her by reminding her that she needed to stay at work until her scheduled end time. 2-SER-333.

- In May 2017, Xu alleged that Dayton was "abusive" when she counseled her about the length and frequency of her breaks and other down-time. 2-SER-336.

- In June 2017, Xu reported to Brown and Iazikov that Dayton's reminders about break times were "abusive" and used to "harass" Xu. 2-SER-338.

- In October 2018, Xu described Dayton's email to engineer John Eltgroth about the need for a routine test as "not healthy" and as an "attack [on] a team worker." 2-SER-340; 2-SER-211-217.

Xu reported the following events as "belittling," "demeaning," and/or "humiliating:"

- In July 2015, Xu reported that she had been "publicly humiliated, bullied, [and] insulted" when she corrected Dayton's prior setup of a certain testing station and refused to assist Dayton with tightening a related function. 3-SER-358.

- In February 2017, Xu reported that Brown was "bullying, abusing, humiliating, and treat[ing] [her] less than human" based on Brown's

6

directive that Xu follow her lead's instruction and verify that gratings had been retested. 3-SER-319.

- In July 2017, Xu felt "disappoint[ed]" and "penalized" when she received a 3% salary raise and 4% bonus because, in her view, she was not being recognized for her "excellent work for the company." 3-SER-369.

- In February 2018, Xu complained that her duties "require[d] the least skill of cleanroom tasks and could be done by employees with less experience and abilities" and opined that, based on her educational background, she should be reassigned to a new supervisor. 3-SER-370.

- In April 2018, Xu reported that Brown wrongly accused of "cheating on break time" when she reminded Xu of the break policy. 3-SER-372.

At no point, however, did Xu ever report any actual discriminatory remarks, innuendo, or offensive physical contact of any kind, as none ever occurred. *See* 2-SER-196-198.

## I. <u>June 2016</u>: Finisar assigns Xu to report to Brown.

Unrelated to her constant flow of quibbles to management, Xu quickly developed a reputation for being a difficult personality and for not getting along well with her co-workers. *See* 2-SER-271 ("Hui was definitely a challenging individual to have to manage. I mean, she was – she was confrontational. She liked to yell and scream repeatedly. And so she – she was difficult to manage. And if the

task was something other than what she wanted to do, … her throughput on it was quite miserable. And … she would, you know, kind of bear down and you know, almost – almost to the point of defiant."); 3-SER-375 ("if it's a job that she doesn't like, she started arguing and basically she would – her voice would go up and … she started getting very argumentative and she would insult people."); 2-SER-264-265 ("she was a difficult person to deal with, confrontational … her contribution to the company and her position was not necessarily strong enough to outweigh all of the morale damage and productivity damage that was created by the confrontations"); 3-SER-379-380 (noting examples of Xu "spanking" Dayton and Xu raising her voice to co-workers); 3-SER-386 ("Hui tends to be argumentative"); 3-SER-393-394 ("… Hui wanted to do her job based on her rules, [and] wanted to be treated differently"); 1-SER-256 ("Q: Do you believe she had difficulty accepting criticism? A: Yes, she did have trouble accepting criticism. Q: Did she have difficulty accepting instruction? … A: … the instruction may take more tolerance on the part of the supervisor to give motivation ... She would expect to be told in some way … why this was the best thing to do.").

In June 2016, Brown assumed the challenge of managing Xu's performance. *See* 1-SER-284. From the outset, Xu voiced objections to working under Brown. *See* 1-SER-150. In fact, Xu rather consistently questioned Brown's (and Dayton's) intelligence and competency, including her education, professional experience, and

technical skills – while, at the same time, touting her own by comparison. *See, e.g.*, 3-SER-404 (Xu referring to Brown as an obviously unqualified, poorly educated Caucasian woman"); 3-SER-344 (Xu: "it is the company's big mistake to keep promoting Ms. Catherine Brown."); 3-SER-336 (Xu: "You are not qualified to challenge my time."); 3-SER-333 (Xu: "You disqualify yourself from being clean room lead."); 2-SER-148-149; 3-SER-376 ("She would insult me by calling me stupid many times. She would tell me that I'm uneducated. And … she went to a very prestigious school in China, that she supervised 500 students in China and that she would teach the teachers in China. And I was nothing compared to her, and she would go on and on about that").

During her deposition, Xu framed the change in her immediate reporting from Iazikov to the "obviously unqualified, poorly educated Caucasian woman" (*i.e.*, Brown) to be the first of four "demotions" by Finisar. *See* 2-SER-234.

## II.  October 2016: Finisar consolidates inventory control responsibilities under new position.

On August 3, 2015, Iazikov and Mossberg provided Xu her formal performance evaluation for the fiscal year 2015. *See* 2-SER-145; 3-SER-405. In that review, Finisar projected the need for future change and adaptation, including some anticipated modifications to Xu's role within the organization:

Hui has two distinctive [functions] in the company, supply chai[n] manager and manufacturing operator for optical efficiency (OE)

9

> testing. These functions do not overlap and both require significant time commitment, [and] both are important. Hui was able to balance both of them so far, but ... At some point a decision may have to be made which of Hui's functions are to be retained and which to be transferred to another employee.

2-SER-145-147; 3-SER-405. On August 4, 2015, Xu signed the review without comment. *Id.*

As predicted, inventory control and supply chain management became increasingly complex and laborious with the continued growth of Finisar. *See* 2-SER-142, 144; 3-SER-409. At the same time, the volume of Xu's optical efficiency testing increased. *See* 2-SER-142-143. Accordingly, Finisar hired a specialist to manage the supply chain and control inventory in October 2016. *See* 2-SER-287. With a dozen years of experience specific to inventory control and supply chain management, Robert Kaltwasser ("Kaltwasser") assumed the vast majority of related duties as Finisar's Inventory Control Specialist. *See* 2-SER-132; 2-SER-287-288; 2-SER-262-263 ("When [Kaltwasser] came on, he basically did it all [with] very minimal training."). Xu characterizes this as the second of four "demotions." *See* 2-SER-235 (Xu Dep. 631:7-12).

## III.  <u>April 2017</u>: Xu requests accommodation for an eye condition.

On April 11, 2017, Xu requested an accommodation for her reported "cataract and dry eye" by submitting a doctor's note stating that "[s]he needs frequent breaks *from looking through the microscope* and should be excused from

10

[doing so] for continuous periods greater than 30 minutes at a time." *See* 2-SER-178-179(emphasis added); 3-SER-416. Consistent with her doctor's recommendation, Finisar adjusted Xu's duties to minimize the use of the microscope, as requested. *See* 2-SER-179; 2-SER-282-283; 3-SER-417.

## IV.    <u>March 2018</u>: Xu triggers an HR investigation.

As the disagreements mounted in the Cleanroom, Xu requested a new supervisor in early 2018. 3-SER-419. In response, Dhar flew from California to Eugene to conduct an in-depth investigation of the tension in the workplace, including Xu's suggestions that Brown and Dayton abused their supervisory authority based on discriminatory and retaliatory intent. *See* 3-SER-389-391; 3-SER-419. Among other investigation, Dhar interviewed Brown, Dayton, Xu, Cohen, Iazikov, Eltgroth, Greiner, and Cindy Bonilla. *See* 3-SER-391-392.

Once complete, Xu did not appreciate the result of the investigation. *See* 2-SER-175. On March 27, 2018, Dhar notified Xu that she was unable to substantiate any unlawful/improper conduct on the part of Brown and Dayton. *See* 2-SER-176; 3-SER-419. Dhar thanked Xu for coming forward, reminded Brown and Dayton of Finisar's EEO policies, and assured Xu that Brown and Dayton were being held accountable to Finisar's EEO policies. *Se*e *id.*; *see also* 2-SER-177.

11

**V.** **March 26, 2018: Xu requests and receives a second accommodation for her eye condition.**

On March 15, 2018, Xu's ophthalmologist submitted a note to Finisar that "Xu has had cataract surgery with distance correction [and] … is not able to perform visual inspection of subtle surface defects." *See* 2-SER-180-181; 3-SER-423. Accordingly, Finisar modified Xu's duties further. *See* 3-SER-398-399; 2-SER-283; 2-SER-180-184; 3-SER-424. On March 26, 2018, Brown detailed the accommodation in writing to Xu, which involved Xu's assignment to the non-exempt position of Manufacturing Technician without visual inspection duties, a relatively small portion of her duties at the time. *See* 2-SER-184; 3-SER-424. Although her duties and responsibilities remained substantially the same, and she actually received a potential increase in compensation, Xu now frames Finisar's accommodation as another *de facto* demotion. *See* 2-SER-632.

**VI.** **May 8, 2018: Xu receives 2018 annual performance review.**

On May 8, 2018, Brown provided Xu her performance evaluation for the fiscal year. *See* 3-SER-426. Xu received average and *above* average performance ratings, *i.e.*, she either "[Met] Expectations" or "Often Exceed[ed] Expectations," and Brown noted that Xu should "[c]ontinue to seek clarification for end of day priorites [sic] [and] [b]alanc[e] the priority shipment for day to day shipments." *Id*. In the Goals and Objectives section of the evaluation – where the form prompts

management to identify areas of improvement – Brown suggested that Xu focus on "[p]ackaging single pieces in 5 minutes or less … [and] [c]ontinue to work on clear communication with lead and manager." *Id*.

On May 21, 2018, Xu signed the evaluation with a note stating, "I'd like to submit an attachment ..." *Id.* On May 27, 2018, Xu emailed Brown and Iazikov "to clarify some points about the metric used in the Goals & Objectives section ..." 3-SER-429. Specifically, Xu questioned Brown's proposed goal for a quicker packaging process and asked Finisar to "use caution when looking only at specific metrics, such as packaging time without looking at other inter-related functions [as] I am very busy packaging on Thursdays and Fridays, but usually not so at the beginning of the week." *Id*.

Now, Xu contends that Finisar's proposed rate of packaging constituted one of the "most hostile or offensive occurrence[s] that happened during [her entire] employment." 2-SER-208-210.

**VII.** <u>**November 16, 2018**</u>**: Finisar offers Xu the choice of severance.**

On November 16, 2018, Dhar called Xu to check in with her about dozens of emails and documents Dhar had received from Xu (in the preceding days) describing various incidents that occurred *years earlier*, going back to 2016. 3-SER-395-397. During the call, Dhar reminded Xu that her prior complaints could not be substantiated after investigation, and reiterated that Finisar had

13

accommodated her in multiple ways already. *Id*. Dhar also asked Xu if, given her apparent discontent, she would be interested in accepting a severance package to seek employment elsewhere with some financial security in the meantime. *Id*.

Two days later, on November 18, 2018, Xu emailed Dhar accusing her of trying to "force [her] out of … employment with the company." 3-SER-433. On November 19, 2018, Dhar corrected Xu's characterization of their conversation and clarified that accepting or not accepting the severance offer was "entirely" Xu's decision. 3-SER-434. Ultimately, Xu decided to reject the severance offer. Far from "forc[ing]" anything, Dhar promptly accepted Xu's decision, and assured her of her continued employment and that a potential separation would not be discussed further. *Id*.; *see also* 2-SER-170, 195.

**VIII. <u>March 24, 2019</u>: Xu notifies Finisar that she would not be returning to work after *un*protected personal leave.**

On February 4, 2019, Xu requested immediate PTO for a "family emergency." *See* 2-SER-151; 3-SER-435. Within minutes, Brown approved her time-off through February 20, with a return date of February 24, 2019. *Id*. Then, on February 21, 2019, Xu explained that her "situation is not changing" and requested leave without pay. *See* 2-SER-152; 3-SER-436. Brown connected her to Jessica Pastor ("Pastor") in Human Resources, who then facilitated a Leave of Absence Request. *See* 2-SER-153-155; 3-SER-436; 3-SER-437.

Xu submitted the request form on February 28, 2019. *See* 2-SER-154; 3-SER-439. While Xu's submission suggested that she needed six months of leave to "[c]are for [her] spouse, child or parent," she later advised Pastor that she actually wanted leave to care for her sister. *See* 2-SER-154-155; 3-SER-437. Because sibling care is not a qualifying basis for FMLA/OFLA leave, Pastor advised Xu on March 1, 2019 that her leave would fall outside FMLA/OFLA but that Finisar was willing to grant her a retroactive 30-day leave of absence for personal reasons through March 24, 2019. *See* 2-SER-155-156; 3-SER-437. Under Finisar's policy, however, any such leave is expressly limited to a maximum of 30 days:

> Under special circumstances, employees with at least one year of employment may be granted a leave of absence without pay when the employee has no other leave available to them. The granting of this type of leave is normally for compelling reasons and requires the manager's approval, which may be granted or withheld for any reason. *Leaves may not exceed one month ...*

3-SER-440 (emphasis added), at p. 21; 2-SER-167.

On March 3, 2019, Xu accepted the offer, including the return date of March 25, 2019, and acknowledged that she would be deemed to have voluntarily resigned if she failed to return at the end of the leave. 3-SER-468. On March 24, 2019, Xu notified Pastor that she would not be returning to work on March 25, 2019, and advised that she had already picked up her personal belongings. *See* 2-SER-168-169; 3-SER-437 ("I'm not able to return ..."); 3-SER-437; 3-SER-440.

IX. **<u>April 25, 2019</u>: Xu files a belated BOLI Charge lacking evidentiary support.**

On April 25, 2019 – about seven (7) years after the beginning of the treatment about which Xu now complains – Xu first filed a complaint ("Charge") with the Oregon Bureau of Labor and Industries ("BOLI"). *See* 2-SER-116-117; 3-SER-470 ("On April 25, 2019, the enclosed complaint was filed …"; "RECEIVED APR 25 2019"); *see also* 2-SER-194; 3-SER-476. After a period of investigation, BOLI dismissed the Charge based on "a lack of substantial evidence." *See* 2-SER-118; 3-SER-490. Specifically, BOLI found the vast majority of her claims to be "untimely," that "[a]ll of [Xu's] complaints [were]… unrelated to Complainant's membership in a protected class," and that her Charge as a whole lacked support. *See* 3-SER-490; 2-SER-119.

**PROCEDURAL HISTORY & RULINGS PRESENTED FOR REVIEW**

On July 23, 2020, Xu filed her lawsuit in the U.S. District Court for the District Court of Oregon alleging: (1) discrimination based on her race, sex, national origin, and age under ORS 659A.030(1)(a) and (b); (2) whistleblower retaliation under ORS 659A.199; (3) disability discrimination and failure to accommodate under ORS 659A.112; (4) retaliation under ORS 659A.030(1)(f); (5) common law wrongful discharge; (6) discrimination based on her race, sex, and national origin under 42 U.S.C. 2000e-2; (7) disability discrimination under 42

16

U.S.C. 12112; (8) retaliation for reporting violations of overtime laws under ORS 653.060(a); and (9) age discrimination under 29 U.S.C. 623.

On December 9, 2022, after Xu's discovery misconduct came to light, and she refused to honor her promises within the Search Protocol Agreement between the parties, Finisar filed its Sanctions Motion. 3-SER-548. On February 27, 2023, U.S. District Judge Michael McShane entered the Sanctions Order. ER-262-270.

On December 27, 2022, Finisar moved for summary judgment on all claims. 2-SER-65. On May 25, 2023, the District Court granted Finisar's Motion for Summary Judgment in its entirety. ER-7-31. That same day, the District Court entered judgment dismissing all of Xu's claims with prejudice. 1-SER-2.

## SUMMARY OF THE ARGUMENT

The District Court ruled on the merits of all claims and, separately, sanctioned Xu *without error*.

First, the District Court correctly ruled that the applicable statutes of limitations barred Xu's claims relating to events occurring prior to April 25, 2018.

Second, the District Court rightly assessed Xu's disability accommodation claim as lacking both a disability and any denial of a reasonable accommodation.

Third, the District Court accurately determined that Xu's timely disparate treatment claims for retaliation and race, national origin, age, disability, and gender

discrimination failed given the absence of any adverse actions and, alternatively, the lack of any evidence of a causal connection or nexus to her protected classes.

Fourth, the District Court properly dismissed Xu's hostile work environment claims as an amalgamation of minor skirmishes arising from "personality conflict[s]," not discriminatory animus, which together fell far short of "severe and pervasive [harassment sufficient] to alter the conditions of [Xu's] employment."

Fifth, the District Court properly rejected Xu's competing theories of wrongful discharge, as neither found support in the record.

Last, the District Court exercised its discretion by issuing the Sanctions Order without the slightest abuse based on Xu's concealment of relevant evidence, misrepresentations of compliance, and active obstruction of discovery.

## STANDARD OF REVIEW

This Court reviews a district court's order granting summary judgment *de novo*. *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 639 (9th Cir. 2003). Summary judgment is appropriate when the record demonstrates no genuine issue of material fact. Fed. R. Civ. P. 56(c). Although this Court, in its review of the record, must draw all reasonable inferences in favor of the nonmoving party, "[t]he moving party is entitled to a judgment as a matter of law [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

18

(1986) (internal quotation marks omitted). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249- 50 (1986). An appellate court may affirm on any grounds warranting summary judgment, irrespective of the basis of the trial court's ruling. *Hall v. N. Am. Van Lines, Inc.*, 476 F.3d 683, 686 (9th Cir. 2007).

As a separate matter, this Court "reviews the district court's … imposition of discovery sanctions … for abuse of discretion." *Goodman v. Staples The Office Superstore, LLC,* 644 F.3d 817, 822 (9th Cir. 2011). Reversal is inappropriate "absent a definite and firm conviction that the district court made a clear error of judgment." *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 379 (9th Cir. 1988). "The question is not whether this court would have, as an original matter, imposed the sanctions chosen by the trial court, but whether the trial court exceeded the limits of its discretion." *Id.*

## ARGUMENT

I.   **The District Court properly granted summary judgment.**

A.   **The applicable statutes of limitations bar Xu's claims of disparate treatment occurring prior to April 25, 2018.**

The District Court correctly found Xu's claims arising prior to April 25, 2018 time-barred. ER-15-16. As the District Court explained, the one-year statute of limitations under ORS 659A.875(1)(a) applies to Xu's state law claims, and the 300-day statutes of limitations under 42 U.S.C. 2000e-5(e)(1) and 29 U.S.C.

626(d) govern her federal claims under Title VII and the ADA. ER-15-16. Xu filed her BOLI Charge on April 25, 2019. *Id.* The District Court, therefore, concluded that "all incidents of discrimination and retaliation occurring prior to April 25, 2018 are time-barred." *Id.*

While Xu concedes that "actions that occurred prior to the April 2018 cut-off may not be directly actionable"[1] – Xu argues that such conduct "may inform the court's analysis" on other claims. Appellant's Opening Brief ("Appellant") at 26 (relying on *Lucke v. Multnomah Cty.*, Case No. CV-06-1149-ST, 2008 WL 4372882, *23 (D. Or. Sept. 22, 2008). Xu misses the point. The Court in *Lucke* analyzed admissibility of dated evidence "to prove timely claims," not timeliness itself. *See Lucke,* 2008 WL 4372882, at *22 ("[D]efendants move to exclude all evidence of events that occurred over 240 days prior to [plaintiff's] filing of her first BOLI complaint… [W]hile time-barred acts may not be considered for purposes of liability, evidence of time-barred acts may be considered to prove timely claims."). So, whatever historical evidence may exist does not change the analysis on the statute of limitations.

Next, Xu vaguely suggests that the District Court's ruling would have been different if only the Court had considered the events before April 25, 2018. Appellant at 27-28 ("[H]ad the District Court … used the [untimely] acts to inform

---

[1] Appellant at 26.

its analysis of Plaintiff's claims, the Court should have reached a different conclusion"). Again, Xu misses the mark. She incorrectly assumes the Court wore temporal blinders. The District Court weighed all the evidence presented by Xu, no matter where it fell on the timeline – only the stale events offered no more support than the occurrences falling inside the limitations period. *See, e.g.,* ER-21, fn. 12 (considering Xu's 2016 Performance Assessment); ER-19 (considering Xu's March 15, 2018 accommodation request); ER-19 (considering Xu's February 25, 2018 complaint to Cohen); *see also generally*, ER-7-26.

Either way, such historical evidence has no bearing on the timeliness of Xu's disparate treatment claims – which the Court correctly decided given the inapplicability of the continuing violations doctrine. ER-16; *see also Tu v. Kaiser Foundation Health Plan of NW,* Civ. No. 07-968-KI, 2008 WL 3871742, at *9 (D. Or. Aug. 19, 2008) (granting summary judgment; "[I]n [plaintiff's] disparate treatment claims, which are for discrete acts of discrimination rather than a hostile environment, the continuing violation does not apply."); *Butler v. City of Eugene, Or.,* F. Supp. 2d 1100, 1104 (D. Or. 2010) (granting summary judgment; "the United States Supreme Court has rejected the 'continuing violations' doctrine for disparate treatment and retaliation claims and has only allowed it for hostile environment claims.") (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002).

**B.    Xu's disability accommodation claim fails for multiple reasons.**

In addressing Xu's disability claims, the District Court correctly observed that (1) Xu's eye condition was the *only* disability alleged; (2) Xu admitted that her eye condition fell short of an actual disability as it "did not impact in any way on [her] daily life;" and (3) Xu conceded that Finisar granted every single one of her requests to accommodate her eye condition. ER-29-30 (citing 2-SER-123-124 (Q: What is the disability … for which you allege you were discriminated by defendant? A … Well, it's because of my eyes, my eyesight. …. Q: Are there any other disabilities for which you allege defendants discriminated against you? A: No."); 2-SER-125; 2-SER-185 ("The only request [for accommodation] was regarding the use of microscope and they accommodated that.  But I did not make any other requests.")).

Now, Xu moves the target by (1) suggesting other disabilities; (2) recasting the nature of her eye condition; and (3) manufacturing all sorts of new requests for accommodation – all in direct contradiction to her sworn testimony.

First, Xu subtly suggests – for the first time on appeal – that this case is really about a failure to accommodate her stress-induced "high blood pressure" and "depression with anxiety, hypertension, shingles." Appellant at 56. This contradicts

not only her pleading but also her sworn testimony, and must be rejected. 5-SER-919; 2-SER-123-124. [2]

Second, Xu admitted under oath that her eye condition never impaired her life activities. 2-SER-125 ("Q: How did your allegedly disabling condition affect your daily life during your employment at Finisar and/or Lightsmyth? A: It did not impact in any way on my daily life."). Here, her counsel argues that her limited use of her eyes "substantially limits the major life activities of (1) seeing [and] (2) reading." Appellant at 53. Again, however, Xu cannot replace her sworn testimony with argument from counsel. *See British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978) ("[L]egal memoranda … are not evidence, and they cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion where no dispute otherwise exists.").

Third, even assuming Xu's eye condition qualifies as a disability, Xu's failure to accommodate claim fails on the undisputed facts. As she admits, Finisar never denied her any reasonable accommodation that she requested. 2-SER-185. In

---

[2] Despite her suggestions, Xu never actually labels these conditions as disabilities. Appellant at 53-54 (arguing that her eye condition impaired her daily life activities without mention of other conditions). Regardless of labeling, Dhar effectively accommodated Xu's stress-related concerns by offering her a leave of absence, which Xu declined. 3-SER-434. While Xu wanted a new supervisor, such a request was unreasonable as a matter of law. ER-30 ("The only 'accommodation' that [that Xu herself requested and Finisar] did not implement was [Xu's] demand for a new supervisor, which, as a matter of law, is not a reasonable accommodation.") (citing *Roberts v. Permanente Med. Grp.,* 690 Fed. App'x 535, 536 (9th Cir. 2017)).

contrast to her sworn admissions, Xu now attempts to frame her "need[] to take frequent breaks" as an accommodation requested by her and denied by Finisar. Appellant at 46 ("in a July 27, 2017 email to Gil Cohen … Plaintiff asked that she be allowed to structure her breaks …"); Appellant at 55 (suggesting "flexibility with her breaks" was "something specifically requested in the Doctor notes provided to Defendant"). This not only contradicts her sworn testimony, it also lacks any record support.[3] For her request, Xu points to two (notably time-barred) communications: (1) a doctor's note dated April 11, 2017 that states that Xu needs "frequent breaks "*from looking through the microscope*," not from working in any capacity whatsoever (Appellant at 7 (citing ER-82 and ER-261)); and (2) "a July 27, 2017 email to Gil Cohen" in which Xu requested to restructure her breaks to "reduce the chance of unnecessary conflict with Liza," not for any reason related to her eye condition. *See* ER-94. Clearly, neither request seeks breaks for any purpose related to Xu's only alleged disability, *i.e.*, her eye condition, including "to put ointment in [her] eye."

Separately, Xu suggests that her November 2018 doctor's note constituted a request for a disability accommodation in the form of a "transfer." Appellant at 47,

---

[3] In fact, when encouraged by her lead, Xu specifically "declined" to seek a break-related accommodation for an unspecified medical issue. ER-74-75 (Xu's Lead: "I suggested that she talk to [Brown] because medical issues could allow some leeway with the [break] policy but she declined;" Brown: "I am unaware of any medical issues other than work restrictions for the microscope").

24

56; ER-91. That, however, is not what the notes says. Dr. Mossberg merely notified Finisar that she had "advised" her patient (Xu) to "change her current position so as to avoid certain harassing co-workers and managers." ER-91. Even if the note can be construed as an accommodation request from Xu, it mentions nothing about Xu's eye condition – *because her conflict with her supervisor had absolutely nothing to do with her eyes* (and was a condition Dr. Mossberg did not even treat). ER-91. And, again, any such request for a new supervisor was *per se* unreasonable.

Under these undisputed facts, Finisar neither had a duty to accommodate nor an obligation to affirmatively inquire about Xu's potential need for a break-related accommodation she never requested. *See, e.g.*, *Davis v. Wal-Mart Stores, Inc.,* Case No. CV-09-1488-HU, 2011 WL 2729238 (D. Or. May 3, 2011) (recognizing that an employer must initiate the interactive process without a request only where the employer "(1) knows that the employee has a disability; (2) knows, or has reason to know, that the employee is experiencing workplace problems because of the disability; **and** (3) *knows, or has reason to know, that the disability prevents the employee from requesting a reasonable accommodation*") (emphasis added); *Dunlap v. Liberty Natural Products, Inc*., Case No. 3:12-cv-01635-SI, 2015 WL 1778477, at *7 (D. Or. Apr. 20, 2015) ("In situations where an employee is unable to inform the employer of the need of an accommodation, … the employer must

assist in initiating the interactive process.'"). Clearly, Xu had no inability to self-advocate, based on her eyes or any other circumstance.

### C. The District Court correctly dismissed Xu's claims relating to disparate treatment allegedly occurring after April 25, 2018.

The District Court granted summary judgment on Xu's timely disparate treatment claims for two independent reasons: (1) none of them rested on adverse employment actions, and (2) Xu failed to offer evidence to support a nexus between any of the alleged adverse actions and her protected activity or class. ER-16-23. Both rulings were correct, and either suffices to affirm the District Court.

### 1. The District Court applied the correct standards for adverse actions.

Amicus suggests that this Court should forge a lower standard for "adverse action" for discrimination claims based on arguments presented in the U.S. Supreme Court's pending matter of *Muldrow v. City of St. Louis*, 143 S. Ct. 2686 (2023). This would be premature. Unless and until the Supreme Court changes the law, a discriminatory adverse employment action in this Circuit must "materially affect" the compensation, terms, conditions, or privileges of employment. *Chuang v. Univ. of Cal. Davis Bd. of Trustees*, 225 F.3d 1115, 1126 (9th Cir. 2000). Notably, Xu does not dispute this standard. Appellant at 20.

The District Court also specifically differentiated the separate standard for what constitutes an adverse action in retaliation claims. ER-17. It observed that, "in

contrast to the standard for discrimination claims," "an adverse employment action in the context of a retaliation claim is 'any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity.'" *Id*.

While the District Court does not show its work to Amicus' liking, at no point does the Court clearly apply the wrong standard. To whatever extent the lines blurred, the lack of clarity stemmed from Xu's scattershot "kitchen sink" allegations, raising every perceived slight occurring in her seven-year employment, along with six protected classes and 80-100 alleged instances of protected activity. Either way, no reversible error occurred given Xu rests her claims on the most minor of occurrences lacking sufficient adversity no matter the standard, as described below. And, even if the District Court applied any incorrect standard (which it did not), and the actions in question meet the applicable standard (which none do), the undisputed facts and law support summary judgment for the separate, independent reason that Xu fails to offer any evidence to support an inference of a causal connection or nexus to any protected activity or class.

### 2. Xu's specific allegations of disparate treatment uniformly fail.

Xu alleges three incidents within the limitations period: (1) an alleged conversion of a temporary demotion to a permanent demotion in April 2018; (2)

her May 8, 2018 performance review; and (3) Dhar's November 18, 2018 offer of severance. Appellant at 32. The District Court rightly granted summary judgment on each. ER-18-23.

### a. The Alleged "Demotion"

Xu characterizes the restructuring of her job on March 26, 2018 – as an accommodation to her request to discontinue "visual inspection[s]"[4] – as a *de facto* demotion. Xu alleges that this decision was both retaliatory and discriminatory, but then fails to support either of these assertions with supporting evidence or authority. In fact, this discrete occurrence is neither an adverse action, related to any protected class or activity, nor within the statute of limitations.

### 1) Time-bar

As a threshold issue, *nothing whatsoever* happened within the limitations period, *i.e.*, on April 26, 2018. More than a month earlier, Finisar granted Xu an accommodation. *See* 3-SER-424; ER-257, ¶ 14 (alleging that Finisar informed her four days before the written correspondence). As Brown wrote in plain English, Finisar implemented the restructuring "effective Monday[,] March 26, 2018." 3-SER-424. Indeed, Xu offers no record evidence that anything actually occurred on April 26, 2018. The letter itself – *which is the only evidence Xu cites* – projects no

---

[4] *See* ER-83.

specific action a month later, aside from the ordinary revisiting of the efficacy of an accommodation during the course of an ongoing interactive process:

> We will restructure your role as described above as an accommodation to you, and will 'try out' the restructured position for a period of one month. **After that time, [Human Resources] and I will meet with you again to discuss how this accommodation is working, whether Finisar can continue to offer you this accommodation, and whether there may be some other available accommodation that Finisar can offer to you.** To the extent that you or your health care provider become aware of some other form of accommodation that will enable you to perform all of the functions of the Manufacturing Technician position, please let me and [Dhar] know ASAP.

3-SER-424 (emphasis added). Based on the letter, April 26, 2018 might come and go with (1) the accommodation being discontinued, (2) the accommodation being modified, or (3) the accommodation simply continuing without discussion and with ongoing intermittent review by management under the supervision of Human Resources – the last of which is what actually occurred according to Xu's own evidence. ER-185-186 (reflecting the interactive process continued and the accommodation remained fluid throughout Xu's employment, *i.e.*, nothing was ever made "permanent;" "I have asked [Brown] to evaluate [Xu's] reasonable accommodation with her every quarter.").

In like circumstances, several courts have affirmed that the "proper focus" for determining timeliness is the date an adverse employment *decision* was made or, at the latest, when notice is given to plaintiff, not when the consequences of the

29

acts became most painful or lasting. *See Abramson v. Univ. of Hawaii*, 594 F.2d 202, 209 (9th Cir. 1979) (affirming summary judgment on Title VII claim as time-barred where defendants denied plaintiff tenure and offered her a "terminal year;" rejecting plaintiff's argument that the date of the eventual loss of her teaching position, rather than the date defendant placed her on notice about denial of tenure, was the proper timing to consider for SOL purposes) (citing *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258-59 (1980) (finding that limitations period commenced at the time of the discriminatory act—when the tenure decision was made and the plaintiff was notified—not at termination of employment or when the decision became irrevocable)); *Phillips v. Leggett & Platt, Inc*., 658 F.3d 452, 455 (5th Cir. 2011) (reversing district court's denial of motion for judgment as a matter of law because ADEA's 180-day limitations period for filing a discrimination charge began to run on date employee received notice of her termination, not her actual termination date); *Shiban v. Intel Corp*., Case No. CV 00–401–PHX–PGR, 2002 WL 31371971, at *3 (D. Ariz. Mar. 28, 2002) (ADEA claim time-barred where plaintiff received notice of anticipated termination during prior performance review meeting because "determining when the statute of limitations begins to run centers on the date when the employee has notice of the unlawful act").

Thus, Xu's "demotion" claim falls outside the limitations period and, for this reason alone, fails as a matter of law.

### 2) No Adverse Action

Timely or not, calling an accommodation a demotion does not make it so. As the District Court noted, Xu offered no evidence that her pay and benefits decreased or that her duties changed beyond the visual inspections she could no longer perform as a result of her eyesight. ER-19-20. To counter, Xu alleges three aspects of the accommodation render it sufficiently adverse to constitute an actionable adverse action: (1) a less prestigious title, (2) the change in exemption status for payroll purposes, and (3) the alleged modification of duties. She is mistaken on all fronts.

### (a) Prestige of Title

Xu specifically complains that she held more "prestige" as a Supply Chain Manager based on her "responsibility and supervisory oversight for a particular department." *See* Appellant at 33-34. This ignores her own sworn testimony that *she never supervised or managed anyone as the Supply Chain Manager*. 2-SER-141 ("Q: Did you supervise anybody when you were the supply chain manager? A: No. Q: Was it your job to manage any other employees when you were the supply chain manager? A: I only managed the supply."). It also disregards that, by 2018, Xu held the title in name only as her supply chain responsibility discontinued *back in 2016. See* 2-SER-132; 2-SER-287-288; 2-SER-262-263. Xu cannot manufacture

a question of fact by contradicting her own pleading, sworn testimony, and written correspondence. *See* Appellant at 33; 5-SER-921.

Under the undisputed facts, her superficial title change offers no support for an actionable *discriminatory* adverse action. *See Maclin v. SBC Ameritech*, 520 F.3d 781, 789-90 (7th Cir. 2008) (affirming summary judgment; "An employee has not suffered an adverse employment action if her title changes but her position remains the same in terms of responsibilities, salary, benefits and opportunities for promotion … Even a change in title that deprives an employee of prestige is insufficient if it lacks more substantive effect."). Likewise, the change falls short of an actionable retaliatory adverse action. *Noonan v. Consolidated Shoe Company, Inc*., 84 F.4th 566, 575-76 (4th Cir. 2023) (affirming summary judgment, in part, because plaintiff's title change from Graphic Designer to Senior Photographer, and assignment to writing projects instead of photography projects, failed to constitute a retaliatory adverse action because "the record does not support the claim that her reduced responsibilities were *objectively* more desirable or prestigious than her increased responsibilities"); *Thompson v. Secretary, U.S. Dep't of Veterans Affairs*, 801 Fed. App'x 688, 693 (11th Cir. 2020) (affirming summary judgment where plaintiff characterized "reassignment as a loss of prestige or responsibility, but with no allegation of decreased pay or grade"); *Hill v. American General Finance,*

32

*Inc*., 218 F.3d 639, 644-45 (7th Cir. 2000) (affirming summary judgment, in part, because "a change in job title … do[es] not, by [itself], qualify" as adverse action).

### (b) Change to Non-exempt Status

Once again, Xu fails to identify a single case buttressing her legal argument, *i.e.*, that reclassifying an employee's status constitutes an adverse action. *See* Appellant at 34. To the contrary, several courts have held that reclassifying an employee falls short of a discriminatory adverse action as a matter of law. *See, e.g., Moreno–Rivera v. DHL Global Forwarding*, 762 F. Supp. 2d 397, 406–07 (D.P.R. 2011) (granting summary judgment, in part, because reclassification to non-exempt was not an adverse action; "Although [plaintiff] characterizes that change in status as a demotion, she has provided no evidence that her duties, responsibilities, or salary changed in any significant way following the reclassification"); *Edwards v. Rochester Inst. of Tech*., Case No. 10-CV-6553-FPG, 2018 WL 1569357, at *14 (W.D.N.Y. Mar. 29, 2018) (granting summary judgment, in part, because reclassification did not constitute an adverse employment action; "[T]he transition … to non-exempt provided her the opportunity to earn compensation for overtime hours worked. … Although Plaintiff contends this was a demotion from a professional position to a clerical position, she does not proffer any admissible evidence in support of this claim."); *Murray v. City of Winston-Salem, NC,* 203 F.

Supp. 2d 493, 502 (M.D.N.C. 2002) (granting summary judgment, in part, because "classifying Plaintiff's new position as non-exempt [was] not an adverse action").

Accordingly, Xu re-frames her argument by claiming that "forcibly convert[ing] [her] to an hourly employee … made [her] breaks considerably more difficult to manage." Appellant at 34. Xu fails, however, to cite anything in the record to support this factual argument. In actuality, her struggles with managing breaks existed long before April 2018. *See, e.g.*, 3-SER-336 (Xu alleging, in May 2017, that Dayton was "abusive" about the length and frequency of her breaks); 3-SER-338 (same). Indeed, Xu had been specifically complaining about being treated like an hourly non-exempt employee in relation to her breaks since 2017. ER - 94. So, again, Xu focuses on form over substance and manipulates the facts to manufacture a timely claim.

### (c)    Alleged Change in Duties

The change to Xu's duties in March 26, 2018 was actually very little change at all. *See* 2-SER-184; 3-SER-424. Xu admitted under oath that the allegedly undesirable aspects of her restructured position, *i.e.*, remnant packaging and washing dishes, pre-existed March or April 2018. *See* 3-SER-419 (stating in February 2018 that, "[f]or over a year, I have been mainly assigned to do packaging and clean dishes in the parts washer"); 3-SER-492 ("After … Nov 2017,

I became the only one person to do packaging."); 3-SER-493 (stating on March 18, 2018 that, "[f]or quite some time, I have been the main and often the only person to keep the parts washer running all day long.")). Xu had also been performing "added manufacturing duties" with no inventory or supply management responsibilities for years by this point. Appellant at 13; *supra*, pp. 10-11. The only duty relieved by the restructuring was visual testing and, according to Xu, that "was never a primary or essential function of [her] job" anyhow. Appellant at 12. Thus, the only actual change in duties resulted from Xu requesting to be excused from "perform[ing] visual inspection[s]" as an accommodation. ER-83; 3-SER-424 ("We will restructure your role … as an accommodation to you."); 2-SER-184; ER-257-261, ¶ 14 (acknowledging that, "[d]uring the March 22, 2018 restructuring meeting, [she] was informed that [the restructuring] was due to the doctor's note …"); Appellant, p. 19 ("In the March 26, 2108 email …, it is noted that this 'accommodation' was being made as a direct result of the letter provided by Plaintiff's medical doctor.").

The District Court correctly recognized the theoretical flaw in Xu's theory, *i.e.*, that granting her requested accommodation constitutes retaliation caused by her own protected request. ER-19 ("[Finisar] simply complied with [Xu's] request and restructured her duties accordingly."). *See Cherkaoui v. City of Quincy*, 877 F.3d 14, 25 n.2 (1st Cir. 2017) (affirming summary judgment on disability

35

discrimination claim, in part, because plaintiff could not show her employer took an "adverse employment action because this [new] assignment was the result of [d]efendant accommodating [p]laintiff's request"). *See also Laird v. Fairfax Cty., VA*, 978 F.3d 887, 894 (4th Cir. 2020) ("If an employee voluntarily requests a transfer [as an accommodation], and the employer agrees to it, there is no actionable adverse action").

### 3) No Causal Connection or Nexus to Protected Class

Even if Xu suffered an adverse action (which she did not), Xu's claims lack any inference of a discriminatory or retaliatory intent. To support her retaliation claim with temporal proximity, Xu highlights the timing of both her time-barred "temporary demotion" on March 26, 2018 and a supposed "permanent demotion" that flowed from the same decision exactly one month later. Appellant, pp. 25, 29. This serves only to demonstrate that her claim is time-barred. And, regardless, no inference of a causal connection arises from the temporal proximity of whatever allegedly happened on April 26, 2018 given not only the expiration of more than two months after the February 25, 2018 communication, but also (a) the overall volume and frequency of Xu's protected activity, and (b) her intervening request for accommodation.

As Xu puts it, "context matters." That is particularly true here, where Xu's alleged protected activity on February 25, 2018 merely involved her re-raising stale issues about which she complained dozens of times before. 2-SER-172 (estimating that she complained 80-100 times); ER-171-172 (reflecting that the substance of her February 25, 2018 email related to event occurring years earlier and a few more recent occurrences involving remanent packaging, a drum Xu had been beating for years). Where, as here, the plaintiff has engaged in such repeated, ongoing, and duplicative complaining, such that the entire period of employment is filled with protected activity, timing is particularly unpersuasive. *See, e.g., Sanders v. BNSF Ry. Co.,* Case No. 17-cv-5106 (ECT/KMM), 2019 WL 5448309 (D. Minn. Oct. 24, 2019) (acknowledging the dilution of any inference where plaintiff "had been engaging in this form of protected activity for a very long time, and in a very large volume"); *Collins v. Kimberly-Clark Pennsylvania, LLC*, 247 F. Supp. 3d 571, 604 (E.D. Penn 2017) (granting summary judgment where employer's "actions evidence[d] not retaliation but patience in dealing with more than a dozen complaints submitted over the course of several years").

Further, the timing of the alleged demotion is more explained by Xu's intervening request for an accommodation on March 15, 2018 than any of her multitude of earlier complaints. ER-20 ("Defendants would have restructured Plaintiff's role to accommodate her alleged disability, regardless of whether she

37

engaged in previous protected activity."); 3-SER-423. And, for obvious reasons, causation and proximity to a request for a health-related job modification (*i.e.*, prompt interactive process) is merely what the law requires – and, thus, proves absolutely nothing. *See Cherkaoui*, 877 F.3d at 25 n.2; *Laird*, 978 F.3d at 894.

Just as temporal proximity falls flat, Xu fails to offer any evidence that Finisar took any discriminatory action "because of" any of Xu's protected classes:

Disability: As discussed, Xu cannot on one hand request an accommodation and, on the other, use that accommodation to establish discrimination "because of" her underlying condition. *Supra*, pp. 36-37.

Age: Xu relies solely on her historical assignment to remnant packaging and her testimony that "two young Caucasian men, w[ere] also not asked just like Brandon Brown in October 2017 … to us[e] remnant scrap for packaging." ER-183. Even if true, this allegation only colors treatment pre-dating November 2017, not anything occurring in April 2018. 3-SER-434 ("After … Nov 2017, I became the only one person to do packaging."). So, again, Xu reminds us that her claims are time-barred.

Gender: Xu rests her gender-based allegations on Dayton calling another female employee a "bitch" and commenting, on other occasions, regarding Xu's "high pitch." These facts neither relate to the alleged demotion nor raise an

inference that Dayton (herself a female) harbored any sort of gender animus.[5] *See, e.g., Franklin v. Nike, Inc*., Case No. CV-07-1667-PK, 2009 WL 6048126, at *4, 9 (D. Or. Nov. 13, 2009) (use of the term "bitches" and reference to a female manager as a "c***" insufficient to assert claim for disparate treatment based on gender because "no evidence suggest[ed] that … use of those terms related to his adverse employment actions"). And, beyond that, Xu merely repeats her allegation of disparate remnant packaging and once again ignores that this assignment dated back to November 2017 at the latest, not April 2018. 3-SER-492.

Race and National Origin: Here, Xu relies exclusively on Sheila Roberts using the name "Wei," instead of "Hui," in an email sent nine months after the alleged demotion. A discrimination claim may never have rested on so little. Even if Roberts played some role in the job restructuring (which she did not), no inference of discrimination could possibly arise from such a single, admittedly-common misnomer/pronunciation.[6] *See, e.g*., ER-147-148.

---

[5] The usage of the term "high pitch" seems to be more a concern of counsel's than Xu's given Xu's own use of it. 3-SER-366, p. 9 (Xu complaining about "Liza [Dayton's] high pitch screaming").

[6] As Xu acknowledged during her deposition, "If I am to pronounce my own name, I will pronounce it as 'Shee Wei,' but in English-speaking world, people will pronounce the first name first, and then the last name. A lot of English people who speak English does [sic] not know how to correctly pronounce my name, but I accept that. So therefore my name can be pronounced as 'Wei Shu.'"

For these three separate reasons, Xu's alleged demotion fails to support a timely disparate treatment claim.

### b.    Xu's 2018 Performance Evaluation

The District Court granted summary judgment on this particular claim for two separate reasons (1) Xu's May 8, 2018 performance review "offer[ed] several positive comments," and was not "unfounded," "undeserved, nor significantly more negative than her previous reviews" and, therefore, fell short of an adverse employment action, and (2) Xu "fail[ed] to show the review is causally connected to her protected class or her protected activity." ER-20-21. Both decisions were correct.

### 1)    No Adverse Action

To paint her evaluation in the most negative light possible, Xu selectively highlights the few constructive comments that can be considered neutral. Appellant at 36. Principally, the review was objectionable to Xu in relation to its apparent "focus on specific metrics, such as packaging time without looking at other inter-related functions" such as her busy workflow "on Thursdays and Fridays, but usually not … at the beginning of the week." 3-SER-429. As the District Court pointed out, however, the review actually contains far more positive commentary than constructive criticism. ER-20-21. By Xu's own account, in fact, Finisar favorably omitted "significant issues" relating to her interactions with colleagues.

Appellant at 19. While Xu now characterizes this as "significantly more negative than the reviews given in the past," Xu received "Exceeds Expectations" or "Consistently Meets Expectations" ratings across the board, and the very same overall score (*i.e.*, "Meets Expectations") as she did in 2017. *See* 3-SER-426, 494; Appellant at 36. Objectively and comparatively, there is absolutely nothing negative about Xu's May 2018 review.

While an undeserved and negative performance review may constitute a retaliatory adverse employment action, neither descriptor applies here. *See Lawson v. Reynolds*, 264 Fed. App'x 546, 548 (9th Cir. 2008) (affirming summary judgment on retaliation claim, in part, because the plaintiff "was given the highest or second-highest rating available in eight of ten categories, … consistent with reviews she received before making any complaints in the areas identified as needing improvement."). For the same reasons, Xu cannot establish a discriminatory adverse action. *See, e.g., Price v. Wheeler*, 834 Fed. App'x 849, 856 (5th Cir. 2020) (affirming summary judgment and finding no discriminatory adverse action where plaintiff subjectively believed she deserved an "Outstanding" rather than a "Fully Successful" rating).[7]

---

[7] Xu argues that these authorities do not "mirror the facts at hand" but, at the same time, offers no case law supporting her position that "Exceed[ing]" or "Consistently Meet[ing] Expectations" is somehow adverse.

### 2) No Causal Connection or Nexus to Protected Class

To support her retaliation claim, Xu obscures the timing of the review by borrowing the temporal proximity from other alleged adverse actions. Appellant at 37 ("one month after making the protected complaint, Plaintiff was temporarily demoted … [and a]fter a one month trial period, this demotion was made permanent … [and, t]hus, the temporary demotion …, the demotion being made permanent …, and the negative performance review can all easily be viewed as retaliatory …"). Xu's flawed logic is telling. The May 8, 2018 review is too attenuated in time from the February 25, 2018 email to alone raise an inference of a causal connection. Because Xu offers nothing more than timing, the District Court correctly held that Xu failed to create an inference of a causal connection.

In relation to her discrimination claim, Xu again places all her eggs in the "temporal proximity" basket. Appellant at 28. This gets her nowhere given her long-standing (if not immutable) protected classes. *Supra*, pp. 3-4.

### c. The Offer of Severance

The District Court rejected Xu's claim that Dhar's November 18, 2018 offer of severance constitutes a timely instance of disparate treatment. The District Court got this right for two clear reasons.

### 1) No Adverse Action

Xu fails to cite any authority finding such an offer to be an adverse action, either retaliatory or discriminatory. Instead, Xu tries to fit a round peg into a square hole by citing temporal proximity to establish the requisite materiality of adversity. Appellant at 30. Otherwise, she relies on a strained interpretation of Dhar's comments during the phone call to transform an offer into something different than a "mere" choice she was free to make. *Id.* at 31. This is absurd. No matter how much "encouragement" Dhar gave (if any)[8], how badly Dhar wanted her to accept the offer (if so), or how Dhar attributed responsibility (if at all) – *nothing came of the offer*. Xu admittedly declined to accept, which was an option made clear by Dhar, and moved on with her employment just as before. 3-SER-434; 2-SER-170, 195.

As a matter of law, Finisar's "mere offer of [a] severance agreement is insufficient to constitute discrimination in the retaliation context." *E.E.O.C. v. Nucletron Corp.*, 563 F. Supp. 2d 592, 598–99 (D. Md. 2008) (granting summary judgment; "[T]he employer's action only reaches the level of retaliation if it denies severance benefits that are otherwise promised or owed or [it] sues to

---

[8] Xu claims that Dhar said "[b]ecause [you] complain repeatedly, you're not happy, so we're helping you be happy, so you'll be happy if you go." Appellant at 40. And, then allegedly, Dhar said "don't answer this question right now … -- consider about resigning on the weekend." Appellant at 20.

enforce the agreement. The mere offer of the agreement, without more, is not adverse … To have committed actionable retaliation, the employer must have taken a sufficiently adverse … action."). The same is true in the discrimination context. *E.E.O.C. v. Sundance Rehabilitation Corp.,* 466 F.3d 490, 501 (6th Cir. 2007) (reversing denial of summary judgment and explaining that "simply offering the [severance] [a]greement was not facially discriminatory" and employees were not deprived of anything by the mere offer).

### 2) No Causal Connection or Nexus to Protected Class

Xu is no more successful attempting to demonstrate either discriminatory or retaliatory intent. In relation to the former, Xu takes two angles to create an inference of race and disability discrimination.[9] She relies solely on (1) false temporal proximity to Roberts' December 17, 2018 email, and (2) a strained interpretation of Dhar's comments during the November 18, 2018 meeting. First, while Roberts' mistakenly called Xu "Wei" and commented that Finisar "may be able to fight" Xu's doctor's note about needing a new supervisor, the District Court correctly observed that (a) Roberts sent that email one month *after* Dhar made the offer of severance, "which negates any causal connection to the severance offer;" (b) calling Xu by another name on a single occasion does not reflect discriminatory

---

[9] Xu makes no effort to contest the Summary Judgment Order relating to national origin, age or gender discrimination in relation to the offer of severance.

intent of any kind; and (c) Finisar "was well within [its] rights to 'try to fight' [Xu's] request" for a new supervisor. ER-23; *Sessoms v. Trustees of Univ. of Penn.*, 739 Fed. App'x 84, 88 (3d Cir. 2018) (affirming summary judgment; "Reasonable accommodation does not entitle an employee to a supervisor ideally suited to her needs"); *EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the [ADA]*, Question 33 (EEOC Notice No. 915.002, Oct. 17, 2002) ("[Q:] Does an employer have to change a person's supervisor as a form of reasonable accommodation? [A:] No."). *See also Kakenowash v. Wilkie*, Civ. No. 1:19-cv-00019-MR-WCM, 2020 WL 106031, at *1 (W.D.N.C. Mar. 4, 2020) (dismissing race discrimination claim where plaintiff alleged his "supervisors and co-workers repeatedly mispronounced (and occasionally misspelled) his surname" based on plaintiff's "fail[ure] to [raise an] inference that [it was] discriminatory in nature"); *Mundy v. Household Finance Corp.*, 885 F. 2d 542, 547 (9th Cir. 1989) (affirming summary judgment; "The mere offer of money in exchange for a release of all claims does not by itself raise an inference [of pretext]").

Second, Xu claims that her "understanding of the meeting included … Dhar laying the responsibility for [the offer] on [her] disability" by stating the mental condition and desire for a new supervisor "was not a Finisar problem but rather [a personal] problem." Appellant at 40 (citing ER-260 and ER-94). That conversation

and the preceding doctor's note had absolutely nothing to do with her eye condition, *i.e.*, the only disability alleged in this case. 2-SER-123-124. According to her own allegations and sworn testimony, Xu had no stress-related disability. *Supra*, pp. 22-23. So, even if we credit Xu's outlandish "understanding of the meeting," it creates no inference of disability discrimination.

In relation to her retaliation claim, Xu again relies solely on temporal proximity. Appellant at 39. Specifically, Xu points to the act of Dr. Mossberg submitting a note on November 1, 2018 notifying Finisar that she advised Xu to avoid certain co-workers and managers based on conditions that Xu admits are not disabilities. ER-85; 2-SER-123-124. No matter how many times Xu frames this note as a request for disability accommodation, her attempts fail. And, Xu cannot raise an inference of retaliatory intent from temporal proximity to **un**protected activity.

**D.    Xu's hostile work environment claim fails as a matter of law.**

To establish a hostile work environment claim, Xu must show that "(1) [s]he was subjected to verbal or physical conduct because of [her protected classes]; (2) the conduct was not welcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Chamat v. Geithner*, 381 Fed. App'x 728, 730 (9th Cir. 2010). As the District Court held, Xu lacks factual and legal support for the first

46

and third elements. *See* ER-23-26 (determining that the "acrimonious relationship between Xu and Dayton "who is also an Asian woman" "seems far more attributable to a personality conflict rather than Plaintiff's protected class.").

Xu limits her hostile work environment claim to only the protected classes of gender and race, and highlights six instances of alleged hostility: (1) Dayton asked Xu, but not her male colleagues, to perform remnant packaging; (2) Dayton complained about Xu using a high pitched voice; (3) Dayton called "multiple women 'bitch' at a work retirement party;"[10] (4) Finisar "demoted" her in April 2018; (5) Dhar extended a severance offer in November 2018; and (6) Xu received a "negative" performance evaluation in May 2018. Appellant at 42-48. Only the first four allegedly relate to Xu's claim of gender-based harassment. Appellant at 45-48. As to race harassment, Xu relies exclusively on the fourth and fifth allegations, which are allegedly racial based solely on their purported nexus to Roberts using the name "Wei." *Supra*, pp. 40-41, 45-46.

Even assuming all facts in Xu's favor, and affording her every reasonable inference, Xu's harassment claim falls far short of "sufficiently severe or pervasive." The (a) lack of any egregious incidents, physical contact, or other

---

[10] Xu does not allege that Dayton called *her* a "bitch," but instead references an email from a co-worker describing a party at which Dayton called the co-worker a "bitch." ER-128-136. Xu makes no allegation that she even witnessed the comments.

severity, (b) the facial neutrality of nearly all of the allegedly harassing conduct, and (c) the innocuous nature of the few instances where her gender (or any other protected class) can arguably be inferred – all combine to foreclose Xu's hostile work environment allegations. While Xu may have *personally* taken offense to another employee being called a "bitch" outside her presence, hearing that others considered her voice "high pitch[ed]," being tasked with arduous tasks, receiving a less-than-glowing performance evaluation, and being offered severance – all of the alleged incidents, together, could not possibly rise to the level of an *objectively* hostile work environment based on any protected class.[11] *See, e.g., Manatt v. Bank of Am.,* 339 F.3d 792, 798 (9th Cir. 2003) (affirming summary judgment; no hostile work environment despite plaintiff suffering jokes using the phrase "China man," ridicule for mispronunciation of names, and employees pulling their eyes back with their fingers to mock the appearance of Asians); *Kortan v. Cal. Youth Auth.,* 217 F.3d 1104, 1111 (9th Cir. 2000) (affirming summary judgment; no hostile work environment where supervisor referred to females as "castrating bitches," "Madonnas," or "Regina" in front of plaintiff on several occasions and

---

[11] Xu cites *Lipsett v. Univ. of Puerto Rico*, 864 F.3d 881, 898 (1st Cir. 1988) for the notion that "[c]ourt[]s prefer to analyze harassment from the victim's perspective." *See* Appellant at 45. That is, however, only part of the analysis. "The objective severity of the harassment must be evaluated from the perspective of a reasonable person in the plaintiff's position." *Hubbard v. Bimbo Bakeries USA, Inc.*, Civ. No. 06-43-JE, 2006 WL 2863222, at *9 (D. Or. Oct. 4, 2006).

called plaintiff "Medea"); *Bahri v. Home Depot USA, Inc*., 242 F. Supp. 2d 922, 950-51 (D. Or. 2002) (granting summary judgment; no hostile work environment claim where plaintiff asserted a male co-worker "(1) repeatedly referred to her as 'missy' and to other female employees as 'girls;' (2) yelled in her face and [publicly] ordered her into the office …; (3) belittled her ideas and suggestions …; (4) made off-color remarks 'in-passing' to male associates; (5) once asked her why she is unable to 'get it on the computer' with respect to learning a particular software program …; (6) repeatedly made unwelcome comments about her style of dress, her hair, and shoes; and (7) questioned and made unwelcome comments about her alleged relationship with a male coworker"); *Mercer v. Cook Cty., Ill*., 527 Fed App'x 515, 521 (7th Cir. 2013) (affirming summary judgment where co-workers referred to "those bitches" and commented "oh, bitch" because these were "the kind of boorish or offensive stray remarks that were 'neither severe or pervasive enough to create an objectively hostile work environment'"); *Sanchez v. City of Santa Ana*, 936 F.2d 1027 (9th Cir. 1990) (holding that no reasonable jury could have found unlawful racial harassment where employer allegedly posted a racially offensive cartoon, made racial slurs, selectively enforced rules against Latinos, refused to provide adequate backup to Latino officers, provided unsafe vehicles to Latino officers, and kept illegal personnel files on Latino officers) as amended on denial of reh'g, (Feb. 27, 1991), as amended on denial of reh'g, (May

24, 1991). As the District Court noted, anti-discrimination statutes are not meant to serve as "general civility code[s] for the American workplace."

### E. Xu's wrongful termination fails as a matter of law.

Xu remains "confused" about whether she voluntarily resigned or was terminated. ER-26. Xu cannot, however, have both (1) a constructive discharge claim based on a resignation stemming from her allegedly intolerable working conditions, and (2) a wrongful termination claim resting on the alleged pretext in Finisar's reason for termination. *Compare* 2-SER-166-169, 171, *with* 5-SER-935 (¶ 54). Whatever her theory, Xu's wrongful discharge claim lacks support.

#### 1. Constructive Discharge

"A constructive discharge claim necessarily requires that the employee actually resign." *Ryan v. Patterson Dental Supply, Inc.*, Case No. CV-98-1177-ST, CV-98-1177-HA, 2000 WL 640859, *25 (D. Or. May 12, 2000). "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." *Carroll v. Holder*, Civ. No. 09-3093-CL, 2011 WL 7091804 (D. Or. Sept. 30, 2011). In other words, without an actual resignation, there is nothing for a court to "assimilate" to a termination.

Here, Xu possesses no constructive discharge claim because she never actually resigned. In fact, Xu believed – not only contemporaneous with her

50

separation but also during her sworn deposition testimony – that Finisar involuntarily terminated her employment. *See* 3-SER-437 ("I am disappointed that you will not grant me any more leave. … I am also disappointed you will not hold my position until this situation is resolved."); 2-SER-43; 2-SER-50. For this reason alone, Xu cannot possibly establish a claim for constructive discharge.

But, in any event, Xu's allegations come nowhere near the exceedingly high standard required of such a claim. As egregious as the working conditions must be to establish a hostile work environment, a constructive discharge theory requires even more. *See Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) ("Where a plaintiff fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge …"). To establish a constructive discharge, "a plaintiff must allege and prove that … the employer intentionally created or intentionally maintained … working conditions [that] were so intolerable that a reasonable person in the employee's position would have resigned because of them." *McGanty v. Staudenraus*, 321 Or. 532, 557 (1995). Working conditions only rise to the level of objectively intolerable, however, "when the[y] … deteriorate … to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood ..."

51

*Carroll*, 2011 WL 7091804, at *25 (quoting *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007)).

The standard is objective, and courts look to the working conditions at the time of resignation. *See, e.g.*, *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir. 1994) (affirming summary judgment of constructive discharge claim where alleged harasser "was fired two and one-half months prior to [plaintiff's] resignation" and, thus, "his sexual harassment had been halted some time before she quit"); *Montero v. AGCO Corp.*, 192 F.3d 856, 861 (9th Cir. 1999) (finding no constructive discharge to support a tangible employment action; "By the time Plaintiff resigned, she was not subject to intolerable working conditions" in that the harassment "had ceased three to four months before she left [the job]"); *accord Poland*, 494 F.3d at 1184 (analyzing the plaintiff's work environment at the time of his resignation and finding no constructive discharge as a matter of law); *Carroll*, 2011 WL 7091804, at *25 (granting summary judgment where plaintiff offered "no evidence that her working conditions had become objectively intolerable at the time she resigned her position").

In this case, nothing even approaches "sufficiently extraordinary and egregious." Far from feeling "compelled" to resign, Xu made clear that she wanted to return, preferably after "more leave" to care for her sister, but was "not able to return" yet. *See* 3-SER-437. The events proximate in time to her termination –

including Xu's 2018 performance review, Dhar's offer of severance, or her alleged demotion(s) – fall far short. *See, e.g., Serrano-Cruz v. DFI Puerto Pico, Inc.*, 109 F.3d 23, 26 (1st Cir. 1997) (no constructive discharge where the plaintiff was "unreasonably sensitive to a change in job responsibilities" and alleged that his cross-country transfer and loss of supervisory duties was a "career" ender; "this evidence of transfer and demotion is insufficient, as a matter of law, to establish a constructive discharge").

### 2. Actual Termination

The District Court correctly rejected Xu's alternative theory based on Xu's failure to offer evidence of pretext. ER-28. Indeed, Xu fails to contest the legitimacy of Finisar's proffered basis for effectuating her termination when she failed to timely return from personal leave. In that regard, Xu remains silent about the following dispositive facts:

(1)　Xu failed to qualify for OFLA or FMLA;

(2)　Company policy prohibited personal leave any longer than 30 days;

(3)　No employee has ever been given personal leave longer than 30 days;

(4)　Pastor notified Xu that she would be considered to have abandoned her job if she failed to return at the end of her leave;

(5)　Xu notified Pastor that she would not be returning because she needed more leave;

(6)     Xu failed to return at the end of her leave; and

(7)     Xu has never requested reinstatement at any time.

Instead, Xu replaces Finisar's proffered rationale with a strawman, and then attacks it. *See* Appellant at 50 ("[Finisar] contend[s] that [Xu] had significant performance issues as well as significant issues with supervisors and coworkers However, barely any of this ever made it into Plaintiff's performance reviews … These inconsistent explanations are indicative of pretext."). At no point has Finisar ever contended that Xu's termination resulted from poor performance. *See, e.g.,* 3-SER-437; 3-SER-439; 3-SER-440. And, of course, rebutting a non-discriminatory reason that Finisar never proffered proves nothing.

## II.     In issuing the Sanctions Order, the District Court exercised its discretion without error, let alone abuse.

Throughout discovery, Xu concealed highly relevant documentation, misrepresented her compliance with written discovery, and actively obstructed Finisar's written discovery and depositions. *See* 2-SER-51-64, 3-SER-525-4-SER-893 Under the circumstances, the District Court exercised leniency with the Sanctions Order. The robust factual record developed below – incorporated here by reference (3-SER-527-537) – not only warranted but required the relief within the Sanctions Order, including the shifting of "(1) the cost of the forensic examination of [Xu's] devices, pursuant to the [Parties'] Protocol Agreement, (2) reasonable

attorney fees incurred reviewing the documents retrieved through the forensic examination, … and ([3]) reasonable attorney fees and costs related to [Finisar's Sanctions] Motion." *See* ER-262.

## A. Xu's counsel mistakenly relied on their client to act in good faith.

Under Rules 26 and 34, Finisar was not just entitled to the documents that it stumbled upon and specifically identifies and requests via supplemental production from Xu. Rather, the law required Xu to produce all documents responsive to Finisar's duly-served RFPs absent legitimate objection. When ESI is involved, compliance necessitates a systematic approach to the collection and production of documents, including keyword searching and careful review of often large data sets. The burden of ensuring a complete production necessarily falls on counsel, as officers of the court. *See, e.g., Abadia-Peixoto v. U.S. Dep't of Homeland Sec.*, Case No. 11-cv-04001 RS (KAW), 2013 WL 4511925, at *2 (N.D. Cal. Aug. 23, 2013) ("In the era of e-discovery, attorneys must take responsibility for ensuring that their clients conduct a comprehensive and appropriate document search.").

As the District Court correctly observed, a party with a pecuniary interest in the outcome of the litigation, or an alleged bad actor, must not be placed in a position to unduly screen or limit the information disclosed to their adversary. *Jones v. Bremen High School Dist. 228*, Case No. 08 C 3548, 2010 WL 2106640, at *8 (N.D. Ill. May 25, 2010) ("As … an interested party, [Plaintiff] is not

qualified to judge whether documents are relevant to the suit."). Courts have coined a name for this e-discovery blunder: "custodian self-collection." *DR Distributors, LLC v. 21 Century Smoking, Inc*., 513 F. Supp. 3d 839, 934-35 (N.D. Ill. 2021) (defining "custodian self-collection" and its related pitfalls, noting that "nothing is to be gained and much is to be lost when counsel blindly rely on a client to self-collect … and [conduct] insufficient inquiry into the adequacy of the client's search," and concluding that sanctions were warranted based on self-collection of ESI); *Calvert v. Red Robin Intern., Inc.,* Case No. 11-03026, 2012 WL 1668980, at *6-7 (N.D. Cal. May 11, 2012) (granting motion for sanctions where plaintiff failed to produce Facebook communications, and questioning the "good standing" status of plaintiff's counsel after counsel "expressed that he was unfamiliar with Facebook technology, and that he had no choice but to rely on [plaintiff's] word, and had performed his duty to oversee to the best of his ability"); *Doe v. Purdue Univ.*, Case No. 2:17-cv-33-JPK, 2021 WL 2767405, at *8 (N.D. Ind. July 2, 2021) ("Though Plaintiff claims he has never posted anything relevant … on his social media, he is not the one who decides what is relevant.").

Universally, courts recognize that measures must be taken to prevent and/or correct custodian self-collection – voluntarily or involuntarily if necessary. *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 435 (S.D.N.Y. 2004) (issuing monetary sanctions for tardy production of relevant emails because "counsel [was]

responsible for coordinating her client's discovery efforts"); *Brown v. SSA Atlantic, LLC*, No. CV419-303, 2021 WL 1015891 (S.D. Ga. Mar. 15, 2021) (ordering plaintiff to produce social media data  and ordering plaintiff's counsel to show cause why sanctions should not be imposed for failing to comply with the Rule's certification of a "reasonable inquiry" due to plaintiff's failure to disclose the existence of these accounts.); *Lee v. Trees, Inc*., No. 3:15-cv-0165, 2017 WL 5147146 (D. Or. Nov. 6, 2017) (granting motion to dismiss with prejudice where forensic expert report revealed plaintiff fabricated text messages; "any lesser sanction would suggest to future litigants that they may manufacture evidence and suffer no meaningful consequences if caught[.]").

Here, Xu's counsel admittedly relied on Xu alone – who has an obvious conflict of interest and has shown an inclination to engineer facts and tamper with testimony (*see, e.g.* 3-SER-530-531) – to singlehandedly conduct the search for, and selection of, documents to be produced to Finisar. *See* 3-SER-548, 555. Not only did Xu prove unreliable in that role, repeatedly, but courts consistently condemn such an approach to e-discovery. On multiple occasions, Xu failed to produce documents with undeniable relevance, none of which could have been simply overlooked in a reasonably diligent, good faith search. *See, e.g.,* 3-SER-550-553; 4-SER-594-687, 695-720, 730-732, 739-879. This became obvious with only three business days left in the discovery period and after a laborious discovery

period with multiple depositions. *See* 3-SER-550. It was then further confirmed by the results of a forensic examination.

### B. Xu's own misconduct could not have been unintentional.

While Finisar made no accusation of intentional misconduct on the part of Xu's counsel, the same cannot be said for Xu. And, whatever good faith her counsel exercised along the way provides basis for reversal given Xu's independent misconduct as detailed in the Sanctions Order – which the District Court issued against Xu, not counsel. *See* ER-262.

And, to be sure, Xu's contention that she acted in good faith and never "intentionally" withheld relevant communications is demonstrably false. That much is clear from the sheer volume of the unproduced documentation, but also its subject matter as compared to the documents she voluntarily produced. The withheld documents not only related to Xu's employment, but also her specific allegations against Finisar and even this lawsuit itself. Xu could not have mistaken them as irrelevant.

For example, during discovery, Xu failed to produce a single communication with her sister Dianna. 3-SER-553. Had Xu run a few obvious word searches in her email (*e.g.*, "harassment," "discrimination," or "retaliation") her searches would have turned up a significant portion of the written communications with her sister. *See, e.g.*, 3-SER-553-554; 4-SER-880. This is particularly troubling for two

reasons. First, a sizeable portion of the withheld documents reflected exchanges with her sister about the alleged mistreatment by Finisar at the very heart of this lawsuit. Second, her sister is the same person that Xu attempted to conceal during deposition discovery, as reflected in Xu's unmistakable plea to Mossberg to tailor his testimony. 3-SER-550; 4-SER-594 ("I beg you, please avoid mentioning [Dianna]'s name to them.").

Finisar received no plausible explanation from Xu's counsel as to how Xu could have unknowingly withheld such communications during the discovery period. Xu either purposefully elected not to search her electronic devices at all, or she intentionally decided not to produce certain documentation – and both are intentional.

## C. The District Court properly ordered Xu to bear the cost of her own discovery misconduct.

"Federal courts possess certain inherent powers, not conferred by rule or statute, to manage their own affairs as to achieve the orderly and expeditious disposition of cases." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 137 S. Ct. 1178, 1186 (2017). Those inherent powers include "the ability to fashion an appropriate sanction for conduct which abuses the judicial process," including the costs and fees associated with forensic examination. *Id.; see also Williams v. State Farm Fire and Casualty Co.,* Case No. 1:17-cv-1147-RJJ-PJG, 2019 WL 6036808,

at *8-9 (W.D. Mich. Nov. 14, 2019) (sanctioning plaintiff by awarding defendant its reasonable costs and fees associated with compelling and facilitating forensic analysis); *McFadden v. Meeker Housing Authority*, Civ No. 16-cv-2304-WJM-GPG, 2018 WL 3348882, at *3, 6 (D. Colo. July 9, 2018) (ordering defendants' counsel to show cause as to why he should not be ordered to pay plaintiff's reasonable fees and costs related to plaintiff's efforts to forensically image defendants' computer; "[Defendants' counsel] made no effort to ensure that his clients took their discovery obligations seriously. Because Plaintiffs' attorneys ended up doing [Defendants' counsel's] work for him, Plaintiffs suffered prejudiced in time and expense.").

In several significant ways, Xu's failure to comply with discovery altered the development of evidence in a manner that was prejudicial to Finisar. Finisar stumbled upon Xu's attempt to meddle with third-party testimony by happenstance on the eve of the close of discovery, only to later learn that they had just completed a grueling 12-month period of discovery on a half-baked record. Combined with her witness tampering, Xu blatantly influenced the development of the record by withholding a large quantity of remarkably relevant documents in some way unfavorable to her case.

In addition to the tainting of the substance of the testimony, Finisar was prejudiced with thousands of dollars of unnecessary and avoidable fees and costs.

Finisar should not be forced to pay (a) the cost of a forensic examination, (b) the attorney fees incurred conducting searches and reviewing all data on Xu's electronic devices for relevance and responsiveness to discovery, or (c) the fees and costs incurred with the filing of the Sanctions Motion, which sought, in part, to require Xu to follow through on her written agreement to cover costs. Clearly, the District Court correctly ordered Xu to comply with her promise to cover the cost of the forensic examination under the terms of the Protocol Agreement. 3-SER-531-532, 537, 543-544 (listing three conditions under which Xu agreed to pay, all three of which proved to be true). Moreover, in the Protocol Agreement, the parties anticipated the potential for additional sanctions and cost-shifting. 3-SER-551; 4-SER-688 ("The Parties agree to … submit any unresolved dispute to the Court for *its consideration of an award of attorneys' fees, costs, or other sanctions.*") (emphasis added). This was prescient. Not only did Finisar bear the cost of the forensic examiner's services, Finisar also incurred the cost of the dozens of hours it took to cull the relevant documents from the materials extracted from Xu's electronic devices, including 16,915 emails and other documents. And, instead of a good faith effort to resolve the dispute and cover a least some significant portion of the costs, Xu forced motion practice by flatly refusing to minimize the unfortunate consequences of her own conduct.

61

Simply put, this was not Finisar's cost to bear. Under Federal Rule of Civil Procedure 37(c)(1), a party who fails to provide information required by Rule 26 or supplement a discovery response is subject to "payment of the reasonable expenses, including attorney's fees, caused by the failure." Additionally, where a party incurs fees and costs "establishing [the other party's] misconduct and in securing relief," courts routinely award the moving party its fees and costs to "ameliorate[] the economic prejudice imposed on the [party]." *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 501-502 (S.D.N.Y. 2016); *3E Mobile, LLC v. Global Cellular, Inc.*, 222 F. Supp. 2d 50, 56-57 (D.D.C. 2016) (late production of documents after depositions warranted imposition of a monetary sanction in the form of fees and costs); *Jackson v. Nassau Cty.*, CV 18-3007 (JS)(AYS), 2022 WL 1460241, *2-3 (E.D.N.Y. May 9, 2022) (rejecting argument that the withholding of documents was "substantially justified" and awarding attorney fees under FRCP 37).

## CONCLUSION

For the foregoing reasons, the Summary Judgment and Sanctions Orders should both be affirmed.

Dated:    January 25, 2023        Respectfully submitted,

LITTLER MENDELSON P.C.

*s/ John A. Berg*
John A. Berg, OSB No. 120018
Christine E. Sargent, OSB No. 172189

*Attorneys for Defendants-Appellees*
Lightsmyth Technologies, Inc. and
Finisar

## STATEMENT OF RELATED CASES

No known related cases are pending in the Ninth Circuit Court of Appeals.

Dated:      January 25, 2024

/s/ John A. Berg
John A. Berg, OSB No. 120018
Christine E. Sargent, OSB No. 172189

*Attorneys for Defendants-Appellees*
Lightsmyth Technologies, Inc. and Finisar

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT AND FORMAT REQUIREMENTS

I, John A. Berg, counsel for Defendants-Appellees Lightsmyth Technologies, Inc. and Finisar certify that this brief complies with the type-volume limitation of Circuit Rule 32-1(a) because it contains 14,000 words (under 14,000), excluding parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, in 14-point Times New Roman.

Dated:      January 25, 2024

*/s/ John A. Berg*
John A. Berg, OSB No. 120018
Christine E. Sargent, OSB No. 172189
LITTLER MENDELSON P.C.
1300 SW 5th Ave
Wells Fargo Tower - Ste 2050
Portland, OR 97201
(503) 221-0309
jberg@littler.com
csargent@littler.com

*Attorneys for Defendants-Appellees*
Lightsmyth Technologies, Inc. and Finisar

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2024, I electronically filed the foregoing document using the appellate CM/ECF system, which will send notification of such filing to:

      Kevin T. Lafky
      James P. Francis
      Lafky & Lafky
      429 Court Street NE
      Salem, OR 97301
      Phone: 503-585-2450
      klafky@lafky.com
      jfrancis@lafky.com

*/s/ John A. Berg*
John A. Berg, OSB No. 120018
Christine E. Sargent, OSB No. 172189
LITTLER MENDELSON P.C.
1300 SW 5th Ave
Wells Fargo Tower - Ste 2050
Portland, OR 97201
(503) 221-0309
jberg@littler.com
csargent@littler.com

*Attorneys for Defendants-Appellees*
Lightsmyth Technologies, Inc. and Finisar

4860-0236-6111.3 / 109353-1001